# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENNSYLVANIA PROFESSIONAL LIABILITY JOINT UNDERWRITING ASSOCIATION,** | : | **CIVIL ACTION NO. 1:19-CV-1121** |
| | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| **TOM WOLF, in his Official Capacity as Governor of the Commonwealth of Pennsylvania,** *et al.***,** | : | |
| | : | |
| **Defendants** | : | |

## **MEMORANDUM**

For the fourth time in as many years, the Pennsylvania General Assembly has passed, and Governor Tom Wolf has signed into law, legislation targeting the Pennsylvania Professional Liability Joint Underwriting Association (the "Joint Underwriting Association" or "Association").  The serial enactments have varied in form and function, but the core of each was the same: an attempt to exercise a degree of state control over the Association, its assets, or both.  The latest iteration, Act 15 of 2019, compels the Association to participate in the state's annual budget and appropriations processes, to accept representation by Commonwealth attorneys, to conduct its operations from Commonwealth-owned facilities, and to comply with certain laws promoting government accountability and transparency. The Association, also for the fourth time, has commenced a lawsuit asking the court to declare the legislation unconstitutional and permanently enjoin its enforcement. Before the court is the Association's request for a preliminary injunction.

## I. Background

The Joint Underwriting Association initiated this lawsuit with the filing of a verified complaint on July 1, 2019, just three days after Act 15 was signed into law. The Association asserts that Act 15 violates its rights under the Substantive Due Process Clause (Count I), the Takings Clause (Count II), the Contract Clause (Count III), and the Procedural Due Process Clause and First Amendment (Count IV). The verified complaint names two defendants: (1) Tom Wolf, in his capacity as Governor of the Commonwealth of Pennsylvania, and (2) the General Assembly of the Commonwealth of Pennsylvania.

The Association immediately moved for a temporary restraining order and preliminary injunction. We denied the request for a temporary restraining order but expedited proceedings on the request for a preliminary injunction, hearing argument on the Association's motion on July 12, 2019. The parties agreed that, for purposes of this motion, the factual records developed in two prior lawsuits—Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf, No. 1:17-CV-2041 (M.D. Pa.), and Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf, No. 1:18-CV-1308 (M.D. Pa.)—constitute part of the record of this case. Accordingly, the findings of fact that follow are largely adopted from the court's summary judgment opinions in JUA I and JUA II, with emphasis and reiteration of facts most pertinent to the nuanced claims in this case.

## II. <u>Findings of Fact</u>

The Joint Underwriting Association is a nonprofit association organized under the laws of the Commonwealth of Pennsylvania. See <u>Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf</u> ("<u>JUA I</u>"), 324 F. Supp. 3d 519, 523 (M.D. Pa. May 17, 2018); <u>Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf</u> ("<u>JUA II</u>"), No. 1:18-CV-1308, ___ F. Supp. 3d ___, 2018 WL 6617702, at *1 (M.D. Pa. Dec. 18, 2018). The Association was initially established by the Pennsylvania Health Care Services Malpractice Act, P.L. 390, No. 111 (1975), and later reestablished by the Medical Care Availability and Reduction of Error (MCARE) Act, 40 PA. STAT. AND CONS. STAT. ANN. § 1303.101 *et seq.*

### A. **The Joint Underwriting Association**

The General Assembly created the Association in response to a decline in the availability of medical malpractice insurance in the Commonwealth in the mid-1970s. <u>JUA I</u>, 324 F. Supp. 3d at 523; <u>JUA II</u>, 2018 WL 6617702, at *1. The MCARE Act tasks the Association to offer medical professional liability insurance to health care providers and entities that "cannot conveniently obtain medical professional liability insurance" through ordinary methods at ordinary market rates. 40 PA. STAT. AND CONS. STAT. ANN § 1303.732(a). Membership in the Association is mandatory for all insurers authorized to write medical professional liability insurance in the Commonwealth. <u>Id.</u> § 1303.731(a).

The MCARE Act assigns four "duties" to the Association, requiring it to: (1) submit a plan of operations to the Commonwealth's Insurance Commissioner ("Commissioner"), (2) submit rates and any rate modifications for approval by the

3

Insurance Department ("Department"), (3) offer insurance as described above, and (4) file its schedule of occurrence rates with the Commissioner. Id. § 1303.731(b)(1)-(4). The Association, like other insurers licensed to operate in the Commonwealth, is "supervised" by the Department. Id. § 1303.731(a); see JUA I, 324 F. Supp. 3d at 525; JUA II, 2018 WL 6617702, at *2. The MCARE Act otherwise provides that all "powers and duties" of the Association "shall be vested in and exercised by a board of directors." 40 Pa. Stat. and Cons. Stat. Ann § 1303.731(a). The Association's plan of operations, developed with and approved by the Department, establishes a 14-member board of directors comprised of the Association's current president, nine directors chosen by the Association's members, and four directors appointed by the Commissioner. JUA I, 324 F. Supp. 3d at 525; JUA II, 2018 WL 6617702, at *2. The plan provides that the Association may be dissolved (1) "by operation of law" or (2) at the request of its members, subject to Commissioner approval. JUA I, 324 F. Supp. 3d at 525; JUA II, 2018 WL 6617702, at *2. The plan also provides that, "[u]pon dissolution, all assets of the Association, from whatever source, shall be distributed in such manner as the Board may determine subject to the approval of the Commissioner." JUA I, 324 F. Supp. 3d at 525; JUA II, 2018 WL 6617702, at *2.

Since its inception, the Association has functioned much like a private insurance company. The Association writes insurance policies directly to its insureds, who pay premiums directly to the Association. JUA I, 324 F. Supp. 3d at 525; JUA II, 2018 WL 6617702, at *3. The Association is funded exclusively by policyholder premiums and investment income, which it holds in private accounts

4

in its own name.  JUA I, 324 F. Supp. 3d at 525; JUA II, 2018 WL 6617702, at *3.  The Commonwealth has never previously funded the Association, nor has it ever been responsible for the Association's debts.  JUA I, 324 F. Supp. 3d at 525; JUA II, 2018 WL 6617702, at *3.  Indeed, prior to recent enactments signed by Governor Wolf, the MCARE Act expressly disclaimed Commonwealth responsibility for claims against and liabilities of the Association.  See JUA II, 2018 WL 6617702, at *3.

The Association hires its own employees, who are paid by the Association, are not part of the Pennsylvania State Employees' Retirement System, and do not receive any other Commonwealth employee benefits.  See JUA I, No. 1:17-CV-2041, 2017 WL 5625722, at *3 (M.D. Pa. Nov. 22, 2017); (Doc. 4-1 ¶¶ 40-42).  The Association leases real estate in its own name without Commonwealth involvement, see JUA I, 2017 WL 5625722, at *3; (Doc. 4-1 ¶ 43), and is presently party to a noncancellable lease for private office space in Blue Bell, Pennsylvania, through September 2022, (see Doc. 4-1 ¶ 45; Doc. 14-3).  The Association has always retained private legal counsel and has never been represented by Commonwealth attorneys or their designees.  See JUA I, 2017 WL 5625722, at *3; (Doc. 4-1 ¶¶ 55-56).

The Association maintains two pools of assets: its "reserves," which represent funds designated for payment of anticipated claims during the calendar year, and its "surplus," which represents all funds not earmarked as reserves.  JUA I, 324 F. Supp. 3d at 525-26; JUA II, 2018 WL 6617702, at *3.  The surplus serves as a safety net of sorts in the event that actuaries underestimate claim maturation or other market factors.  JUA I, 2017 WL 5625722, at *3; JUA I, 324 F. Supp. 3d at 526;

JUA II, 2018 WL 6617702, at *3.  As of December 2016, the Association had a surplus of $268,124,502.  JUA I, 324 F. Supp. 3d at 526; JUA II, 2018 WL 6617702, at *3.

### B. Prior Legislative Acts and Lawsuits

The legislative and litigational volley leading to the instant lawsuit began in 2016, with the General Assembly's first attempt to access some of the Association's assets.  Act 85 of 2016 directed the Association to make a $200,000,000 loan to the Commonwealth from its unappropriated surplus.  See Act of July 13, 2016, No. 85 ("Act 85"), § 18.  Next came Act 44 of 2017, in which the General Assembly repealed Act 85, declared the Association to be "an instrumentality of the Commonwealth," and ordered the Association, under threat of abolishment, to pay $200,000,000 to the State Treasurer for deposit into the General Fund.  See Act of October 30, 2017, No. 44 ("Act 44"), §§ 1.3, 13.  Act 41 of 2018, enacted the following year, took the most drastic steps to date, attempting to fold the Association into the Department, shift control of the Association to a board of political appointees, oust the Association's president, and mandate transfer of all of the Association's assets to the Department within 30 days.  See Act of June 22, 2018, No. 41 ("Act 41"), § 3.

The Association answered each enactment with a lawsuit raising constitutional challenges to the legislation and seeking declaratory and injunctive relief.  The first of those lawsuits, concerning Act 85, has been held in abeyance at the parties' request pending the outcome of litigation as to Act 44 and Act 41.  See Pa. Prof'l Liab. Joint Underwriting Ass'n v. Albright, No. 1:17-CV-886, Doc. 34 (M.D. Pa. June 14, 2018).  In the second lawsuit, JUA I, we preliminarily and later permanently enjoined enforcement of Act 44 against the Association, holding that

6

notwithstanding its statutory origin, the Association is a private entity, its surplus funds are private property, and Act 44's attempt to take those funds without just compensation violated the Takings Clause of the Fifth Amendment.  See JUA I, 324 F. Supp. 3d at 532-40.  In the third lawsuit, JUA II, we preliminarily and later permanently enjoined Act 41, concluding that the legislation was an attempt to do indirectly what JUA I told the General Assembly it could not do directly—take the Association's funds.  See JUA II, 2018 WL 6617702, at *14-15.  Both JUA I and JUA II are on appeal before the Third Circuit Court of Appeals and are calendared for oral argument on September 12, 2019.

On June 28, 2019, Governor Wolf signed into law Act 15 of 2019, Section 7 of which is the subject of this lawsuit.  See Act of June 28, 2019, No. 15 ("Act 15"), § 7.  Unlike its predecessors, Act 15 does not take the Association's funds directly, alter its governance structure or board composition, replace its employees, or otherwise change its manner of operating.  Rather, Act 15 provides for Commonwealth appropriations to the Association and imposes what the General Assembly has characterized as "accountability" requirements.  In pertinent part, Act 15:

- provides that the Association shall be funded through appropriations determined by the General Assembly;

- requires the Association to submit a written budget estimate to the Secretary of the Budget as required of administrative departments, boards, and commissions under Section 615 of the Administrative Code, at least once annually and also as the Governor may request;

7

- requires an agent of the Association to appear at a public hearing of the Pennsylvania Senate's Banking and Insurance Committee and the Pennsylvania House of Representatives' Insurance Committee to testify concerning the estimate within 30 days after its submission;

- requires the Association to appear annually before the Appropriations Committees of both chambers of the General Assembly to testify as to the Association's fiscal status and request appropriations;

- requires the Association to hold quarterly public meetings under the state's open meetings law to discuss its actuarial and fiscal status;

- declares that the Association "shall be considered a Commonwealth agency" for purposes of the Commonwealth Attorneys Act, the Right-to-Know Law, the PennWATCH Act, and the Commonwealth Procurement Code; and

- requires the Association to (1) transmit a list of all employees to the Auditor General, State Treasurer, Secretary of the Budget, and Legislative Data Processing Center; (2) conduct its operations in Commonwealth-owned facilities; and (3) coordinate with the Department of Revenue to ensure that Association employees with access to federal tax information meet that department's requirements for access to such information.

Id. § 7. Section 7 of Act 15 took effect immediately upon signing on Friday, June 28, 2019. Id. § 13.

### III. Legal Standard

The court applies a four-factor test in determining the propriety of preliminary injunctive relief. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." Id. This showing must be "significantly better than negligible but not necessarily more likely than not." Id. The second factor carries a slightly enhanced burden: the movant must

establish that it is "more likely than not" to suffer irreparable harm absent the requested relief.  Id.  Only if these "gateway factors" are satisfied may the court consider the third and fourth factors: the potential for harm to others if relief is granted, and whether the public interest favors injunctive relief.  Id. at 176, 179.  The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief.  Id. at 179.

**IV.     Discussion**

The Association entreats the court to preliminarily enjoin enforcement of Act 15.  The Association remonstrates broadly that Act 15 directly contravenes the court's holdings in JUA I and JUA II and causes it immediate and irreparable constitutional injury.  As the court indicated during oral argument, our analysis in this case rises and ultimately falls on the irreparable harm prong.  The required showings on likelihood of success and irreparable harm are correlative: the weaker the plaintiff's showing on the merits, the more will be required of the showing on irreparable harm, and *vice versa*.  Reilly, 858 F.3d at 179 (citation omitted).  Only if both factors are met will preliminary injunctive relief be appropriate.  Id.

The Association has arguably demonstrated a "significantly better than negligible" likelihood of success on the merits of at least some of its claims.  See id.  Our holdings in JUA I and JUA II stand for the threshold propositions that the Association is a private entity, its assets are private property, and the Fifth Amendment prohibits the Commonwealth from either directly or indirectly taking those assets for public use without just compensation.  See JUA I, 324 F. Supp. 3d at

9

538; JUA II, 2018 WL 6617702, at *14.  While JUA I and JUA II are not dispositive as to the new claims raised in this case, they are controlling as to these issues, and they confirm that there are limits to the Commonwealth's power over the Association.

Act 15 tests the outer bounds of our prior holdings, tasking the court to answer the difficult question that we acknowledged but did not need to resolve in JUA II: what degree of authority, if any, may the Commonwealth exercise over the Association?  The answer is informed by our prior rulings.  Defendants cite no decisional law that would support Act 15's attempt to require the Association to accept Commonwealth appropriations, comply with Commonwealth budgeting processes, relocate its operations to Commonwealth-owned facilities, or assent to representation by Commonwealth attorneys.  These provisions of Act 15 seemingly run headlong into the court's rulings in JUA I and JUA II that the Association is a private entity with constitutional rights.  Other provisions of Act 15 take a more subtle approach.  For example, defendants raise the logical point that, despite its private-entity status, the Association is statutorily designated to perform a public function and ought to be subject to certain governmental transparency laws.

At this juncture, we need not determine whether all or part of Act 15 is likely to survive constitutional scrutiny, because the Association's motion fails on a more fundamental ground: it has not shown an imminent likelihood of irreparable harm.  To support its request for preliminary injunctive relief, the Association must make a "clear showing" that "irreparable harm is *likely* in the absence of an injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  "Likely" in this context means "more likely than not."  Reilly, 858 F.3d at 179.  Mere speculation about the

"possibility" of injury will not suffice. Winter, 555 U.S. at 22; see also In re Revel AC, Inc., 802 F.3d 558, 571 (3d Cir. 2015) (citation omitted).

In each of the prior iterations of this case, the circumstances compelled the "extraordinary remedy" of a preliminary injunction. Act 44 gave the Association just one month to transfer $200,000,000 to the Commonwealth and threatened to abolish the Association if it failed to do so. Act 41 imposed a 30-day deadline for the Association to transfer *all* of its assets to the Commonwealth. Sovereign immunity would have prevented the Association from ever recouping the massive financial losses flowing from the forced transfers under Acts 44 and 41. Accordingly, in both cases, under ticking legislative clocks, we held that preliminary injunctive relief was necessary to preserve the status quo. In the context of an analysis of irreparable harm, Act 15 stands in stark contrast and bears little resemblance to its predecessors—it takes nothing directly from the Association, contains no deadline for compliance, articulates no penalties for noncompliance, and requires no immediate action by or toward the Association.

The Association avers broadly that Act 15 will eliminate its ability to maintain this series of lawsuits, force it to "immediately" relocate to Commonwealth-owned office space, and grant the Commonwealth "power to control all of JUA's funds." (Doc. 5 at 18-20). But the Association identifies nothing in Act 15 or in the instant record suggesting that the law's present effect will be as sweeping as portrayed. All of the concerns cited by the Association are phrased in hypothetical terms. The Association claims, for example, that "much mischief *could* come" from application of Act 15's budget and appropriations provisions. (Doc. 5 at 20 (emphasis added)).

11

Similarly, during oral argument, counsel speculated that, without an injunction, the Commonwealth *could* require the Association to move tomorrow; that Governor Wolf *could* request a budget estimate this week; and that the Attorney General's Office *could* relieve current counsel for the Association of their duties instantly.

The Association's language of choice exposes its own uncertainty as to what harm Act 15 may bring or when that harm will occur. This uncertainty alone fells the Association's request for preliminary injunctive relief. What is more, counsel for Governor Wolf unequivocally represented to the court that the executive branch simply does not intend to take the actions predicted by the Association. For all of these reasons, we find that the Association has failed to make a "clear showing" that irreparable harm is "more likely than not" to occur absent a preliminary injunction. See Winter, 555 U.S. at 22.

## V. Conclusion

We conclude that the Association has not identified an imminent threat supporting the "extraordinary remedy" of preliminary injunctive relief, see Winter, 555 U.S. at 22, and will accordingly deny the Association's motion. Our ruling is based on the record as it now stands, crediting the representations by Governor Wolf's counsel that the executive branch will not take the actions that the Association fears. We underscore that our denial of the Association's motion is without prejudice to the Association's right—in the event of a material change in

circumstances—to return to this court with a renewed motion for preliminary injunctive relief. An appropriate order shall issue.

                                                   /S/ CHRISTOPHER C. CONNER
                                                   Christopher C. Conner, Chief Judge
                                                   United States District Court
                                                   Middle District of Pennsylvania

Dated:       July 17, 2019