# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Pennsylvania Professional Liability Joint    :
Underwriting Association,                     :
                                             :
        Plaintiff                        :    NO. 1:19-cv-01121-CCC
                                             :    (Chief Judge Conner)
    v.                                   :
                                             :    ELECTRONICALLY FILED
Tom Wolf, in his official Capacity as        :
Governor of the Commonwealth of              :
Pennsylvania; and the General Assembly       :
of the Commonwealth of Pennsylvania          :
                                             :
        Defendants.                      :

## PLAINTIFF'S BRIEF
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Kevin J. McKeon, I.D. # 30428
Dennis A. Whitaker, I.D. # 53975
Melissa A. Chapaska, I.D. # 319449
Hawke McKeon & Sniscak, LLP
100 North Tenth Street
Harrisburg, PA  17101
(717) 236-1300
(717) 236-4841
kjmckeon@hmslegal.com
dawhitaker@hmslegal.com
machapaska@hmslegal.com

*Counsel for*
*Pennsylvania Professional Liability*
*Joint Underwriting Association*

## Table of Contents

I.    INTRODUCTION AND SUMMARY ..............................................................8

II.   PROCEDURAL HISTORY ........................................................................11

III.  STATEMENT OF FACTS .........................................................................12

IV.   STATEMENT OF QUESTIONS INVOLVED ...........................................12

V.    ARGUMENT ............................................................................................13

    A.  Act 15 is unlawful ...............................................................................13

        1.   JUA has constitutional rights: it is a private entity possessed of private property; the state cannot alter that status with *post hoc* legislation such as Act 15. ...............................................................13

        2.   The collective impact of Act 15's subjection of JUA to statutes that apply only to state entities robs JUA of its private status, captures JUA and its private assets for the state, and deprives JUA of constitutional rights ..............................................16

        3.   The individual impact of each of the statutes Act 15 imposes on JUA violates JUA's constitutional rights .....................................36

    B.  The court should grant permanent injunctive relief ...................................55

VI.   CONCLUSION ........................................................................................57

# Table of Authorities

## Cases

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978) ..................................................................... 28, 32

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................ 13

*Arroyo-Melecio v. Puerto Rico American Insurance Co.*,
    398 F.3d 56 (1st Cir. 2005) ............................................................. 22

*Bechtold v. Coleman Realty Co.*,
    79 A.2d 661 (Pa. 1951) ................................................................... 29

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*,
    528 F.3d 176 (3d Cir. 2008) ........................................................... 55

*Board of R.R. Trainmen v. Virginia*,
    377 U.S. 1 (1964) ........................................................................... 45

*Chicago, B. & Q. R. Co. v. Chicago*,
    166 U.S. 226 (1897) ....................................................................... 19

*Cipriani v. Lycoming Cnty. Hous. Auth.*,
    177 F. Supp. 2d 303 (M.D. Pa. 2001) .......................................... 44, 47

*County of Mercer v. Amundsen*,
    879 A.2d 366 (Pa. Cmwlth. 2005) .................................................. 22

*Dana Corp. v. W.C.A.B. (Beck)*,
    782 A.2d 1111 (Pa. Cmwlth. 2001) ................................................ 24

*DeLoach v. Bevers*,
    922 F.2d 618 (10th Cir. 1990) ........................................................ 45

*Denius v. Dunlap*,
    209 F.3d 944 (7th Cir. 2000) .......................................................... 44

*Department of Envtl. Res. v. Butler Cnty. Mushroom Farm*,
    454 A.2d 1 (Pa. 1982) .................................................................... 25

*Doe v. Pa. Bd. of Prob. & Parole*,
    513 F.3d 95 (3d Cir. 2008) ............................................................. 33

*Durre v. Dempsey*,
  869 F.2d 543 (10th Cir. 1989) ............................................................................44

*eBay, Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ..........................................................................................55

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983) ..........................................................................................28

*Fletcher v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n*,
  914 A.2d 477 (Pa. Cmwlth. 2007), *aff'd*, 985 A.2d 678 (Pa. 2009) ....................24

*Gavin v. Loeffelbein*,
  205 A.3d 1209 (Pa. 2019) ..................................................................................39

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ..........................................................................................45

*Greene v. McElroy*,
  360 U.S. 474 (1959) ..........................................................................................32

*Guajardo-Palma v. Martinson*,
  622 F.3d 801 (7th Cir. 2010) ............................................................................45

*Harristown Development Corp. v. Dept. of General Services*,
  614 A.2d 1128 (Pa. 1992) ........................................................................... 42, 43

*Hart v. Gaioni*,
  261 F. App'x 66 (9th Cir. 2007)........................................................................45

*Heffner v. Murphy*,
  745 F.3d 56 (3d Cir. 2014) ............................................................ 32, 33, 38, 42

*Kentucky W. Va. Gas Co. v. Pa. Pub. Util. Comm'n*,
  837 F.2d 600 (3d Cir.), *cert. denied,* 488 U.S. 941(1988)...................................47

*Meier v. Anderson*,
  692 F. Supp. 546 (E.D. Pa. 1988).......................................................................32

*Northeastern Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
  938 F.3d 424 (3d Cir. 2019) ..............................................................................55

*Ober v. Miller*,
  No. 1:04-CV-1669, 2007 WL 4443256 (M.D. Pa. Dec. 18, 2007),
  *aff'd*, 395 F. App'x 849 (3d Cir. 2010)................................................................44

*Pennsylvania Coal Co. v. Mahon*,
  260 U.S. 393 (1922).................................................................36

*Pennsylvania Prof'l Liab. Joint Underwriting Ass'n v. Wolf*,
  2019 WL 3216658 (M.D. Pa. 2019) ....................................... 15, 20, 56

*Pennsylvania Prof'l Liab. Joint Underwriting Ass'n v. Wolf*,
  324 F. Supp. 3d 519 (M.D. Pa. 2018).......................................... passim

*Pennsylvania Prof'l Liab. Joint Underwriting Ass'n v. Wolf*,
  381 F. Supp. 3d 324 (M.D. Pa. 2018).......................................... passim

*Powell v. Alabama*,
  287 U.S. 45 (1932)...................................................................45

*Rotkiske v. Klemm*,
  890 F.3d 422 (3d Cir. 2018), *aff'd*, 140 S. Ct. 355 (2019) ...................................24

*Shapp v. Sloan,*
  391 A.2d 595 (Pa. 1978), *appeal dismissed sub nom.*
  *Thornburgh v. Casey,* 440 U.S. 942 (1979)...........................................22

*Sveen v. Melin*,
  138 S.Ct. 1815 (2018)...................................................... 27, 28, 30, 41

*TD Bank NA v. Hill*,
  928 F.3d 259 (3d Cir. 2019) .......................................................55

*Texas Catastrophe Prop. Ins. Ass'n v. Morales*,
  975 F.2d 1178 (5th Cir. 1992) ........................................... 23, 27, 46, 47

*United Mine Workers v. Illinois State Bar Ass'n*,
  389 U.S. 217 (1967)..................................................................44

*United States v. Flanagan,*
  679 F.2d 1072 (3d Cir.1982), *rev'd on other grounds*, 465 U.S. 259 (1984).......45

*United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv.*
  *Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*,
  842 F.3d 201 (3d Cir. 2016) ................................................... 28, 31

*Watters v. Bd. of Sch. Directors of City of Scranton*,
  400 F. Supp. 3d 117 (M.D. Pa. 2019)..............................................28

*Whittington v. Maes*,
  655 F. App'x 691 (10th Cir. 2016)..................................................44

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................56

## Statutes

1 Pa. C.S. § 1924 ...........................................................................................25

26 U.S.C. § 6103(b) ......................................................................................54

40 P.S. § 1303.712(f) .....................................................................................31

40 P.S. § 1303.731(b) .....................................................................................31

40 P.S. § 1303.732(a) .................................................................................8, 37

40 P.S. § 221.2-A ...........................................................................................35

40 P.S. §§ 221.14 – 221.16 ...........................................................................35

40 P.S. §§ 221.6-A – 221.9-A .......................................................................35

71 P.S. § 234 ..................................................................................................51

71 P.S. § 235 ..................................................................................................38

71 P.S. § 235(b) ..............................................................................................25

71 P.S. § 86 ....................................................................................................53

72 P.S. § 1804 ................................................................................................33

Act 15 of 2019, P.L. 101, No. 15 ........................................................ passim

Act 41 of 2018, P.L. 273, No. 41 ........................................................ passim

Act 44 of 2017, P.L. 725, No. 44 ........................................................ passim

Commonwealth Attorneys Act,
   71 P.S. §§ 732-101 – 732.504 ..................................................... passim

Commonwealth Procurement Code,
   62 Pa. C.S. §§ 101 – 4509 ............................................... 26, 30, 50, 51

Pennsylvania Web Accountability and Transparency (PennWATCH) Act,
   72 P.S. §§ 4664.1 – 4664.6 .......................................................... passim

Right-to-Know Law,
   65 P.S. §§ 67.101 – 67.3104 ........................................... 20, 26, 30, 42

Sunshine Act,
   65 P.S. §§ 701 – 716 ...................................................................... passim

## Regulations

31 Pa. Code § 242.13 ...............................................................................31

31 Pa. Code §§ 147.1-147.14 ..................................................................31

4 Pa. Code §§ 1.801- 806 .........................................................................46

## Constitutional Provisions

U.S. Const. Amend. I ........................................................... 11, 12, 44, 47

U.S. Const. Amend. V............................................................ 12, 15, 17, 19

U.S. Const. Amend. XIV, § 1 ................................................... 12, 32, 45

U.S. Const. Article I, § 10.................................................. 10, 11, 12, 27

## I.    INTRODUCTION AND SUMMARY

Plaintiff, the Pennsylvania Professional Liability Joint Underwriting Association (JUA), requests this court to grant summary judgment and declare unconstitutional section 7 of the Commonwealth of Pennsylvania's Act 15 of 2019, P.L. 101, No. 15 (Act 15[1]), permanently enjoin Act 15's enforcement against JUA on that basis, award JUA all fees and costs incurred in this action, including reasonable attorneys' fees, and grant such other relief as the court deems just and equitable under the circumstances. Act 15's provisions rob JUA of its character, autonomy, and financial independence as a private business, in violation of the Constitution.

JUA is a private nonprofit association of insurance companies that operates as a private insurer, formed in 1975 and tasked by the Commonwealth of Pennsylvania to provide medical professional liability (MPL) insurance to health care providers who "cannot conveniently obtain" it "through ordinary methods at rates not in excess of those applicable to [those] similarly situated." 40 P.S. § 1303.732(a).  At present and over the past decade, JUA has enjoyed a growing surplus.  Since 2016, the state has attempted in a succession of statutes to access

---

[1] References in this brief to "Act 15" refer only to Section 7 of Act 15, the Administrative Code amendments in Act 15 applicable to JUA, unless the context indicates otherwise.

that surplus for General Fund purposes.  The court has permanently enjoined

enforcement of two of Act 15's predecessor statutes. In *Pennsylvania Prof'l Liab.*

*Joint Underwriting Ass'n v. Wolf* (*JUA I*), 324 F. Supp. 3d 519 (M.D. Pa. 2018),

the court enjoined Act 44 of 2017, which required JUA to give $200,000,000 of its

surplus to the state on pain of dissolution.  In *Pennsylvania Prof'l Liab. Joint*

*Underwriting Ass'n v. Wolf* (*JUA II*), 381 F. Supp. 3d 324 (M.D. Pa. 2018), the

court enjoined Act 41 of 2018, which decreed that JUA and all of its assets must be

absorbed into the state Insurance Department. Act 15 is the fourth in that

succession of statutes. [2]

In determining in *JUA I* and *JUA II* that JUA is a private entity possessed of

private property and that the state may not take that property directly or indirectly,

the court cited JUA's long history of autonomy from the state, emphasizing that

JUA never has received state funding of any kind and always has operated in a

_____

[2] The first statute, Act 85 of 2016, which required JUA to lend $200,000,000 to the
state, is the subject of *Pennsylvania Prof'l Liab. Joint Underwriting Ass'n v.
Albright*, No. 1:17-CV-886 (M.D. Pa.), a lawsuit that has been stayed pending the
outcome of *JUA I* and *JUA II*.

Defendants appealed *JUA I* and *JUA II* to the United States Court of Appeals for
the Third Circuit at Case Numbers 18-2297/18-2323 and 19-1057/19-1058 (3d
Cir.). Following briefing, the Third Circuit directed the parties to address the
effect, if any, of Act 15 and the present lawsuit on the issues in *JUA I* and *II*, and
thereafter advised that the appeals would be placed on the Court's C.A.V. list until
the Court directs otherwise, with status reports submitted every 120 days.

manner "largely indistinguishable from other private insurers in the Commonwealth." *JUA II* at 333. Act 15 purports to radically change that paradigm. It forces JUA to operate on the basis of an annual state budget appropriation. It subjects JUA to the budgetary process followed by state agencies, pursuant to which the state gains control over all of the appropriation recipient's funds from whatever source. It forces JUA to use a state building for its offices, obtain its legal representation from state lawyers, and procure all of its goods and services through the state procurement process. And, like state agencies that draw their funding from taxpayer revenue, it subjects JUA to a series of accountability statutes that allow public access to JUA's meetings, records, and finances.

Act 15 violates JUA's constitutional rights. Forced state funding, Act 15's signature provision, taints all of the other provisions, because it provides the pretext to subject JUA to all of the other "accountability" measures that Act 15 imposes. For that reason, Act 15's provisions must be analyzed collectively. Viewed collectively, these provisions are every bit as much of a taking as Acts 44 and 41, because not only do they insinuate the state into a financial interest in JUA and limit JUA's use of its funds, they also erase traits that have long characterized JUA's private identity, fundamentally changing JUA's character. Act 15's provisions likewise collectively violate the Contracts Clause because they wrest significant managerial control from JUA's Board, substantially impairing JUA's

Plan of Operations (Plan), the contract between and among JUA and its members. Finally, Act 15's provisions collectively violate JUA's substantive due process rights: put simply, there is no rational basis for treating a private entity in any of the ways Act 15 treats JUA.

Viewed individually, Act 15's provisions are no less a violation of JUA's constitutional rights. In particular, if the court agrees that Act 15's requirement that JUA be funded through a state appropriation must fail, there is no plausible basis for any of the other provisions. Of note, the requirement that JUA use Commonwealth lawyers rather than its counsel of choice also violates JUA's First Amendment and procedural due process rights. Each of Act 15's requirements, viewed individually, violate the Contracts Clause and substantive due process.

## II.    PROCEDURAL HISTORY

The procedural history is set forth in the court's opinion on JUA's preliminary injunction request (Doc. 16). Thereafter, the court adopted a briefing schedule for cross-motions for summary judgment, as amended (Doc. 35).

## III.    STATEMENT OF FACTS

The court has set forth the operative facts in its earlier opinion, Doc. 16. The parties stipulated and the court has ordered that the factual record from *JUA I* and *JUA II* is part of the record in this case (Doc. 39).  JUA also has filed a statement of additional undisputed facts relevant to Act 15 (Facts), supported as necessary by the declaration of JUA President and CEO Susan Sersha (Sersha Dec.).

## IV.    STATEMENT OF QUESTIONS INVOLVED

1.    Whether Act 15, viewed as a collective whole and on a provision-by-provision basis,  violates JUA's rights under the United States Constitution's:

      a.    Fifth Amendment Takings clause;

      b.    Article I, Section 10 Contracts Clause; and

      c.    Fourteenth Amendment substantive due process guarantee?

2.    Whether Section 1505-B (1) of Act 15, subjecting JUA to the Commonwealth Attorneys Act, violates JUA's right of free speech under the First Amendment and right to procedural due process under the Fourteenth Amendment?

Suggested Answer: Yes, to all.

## V.    ARGUMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  For the reasons that follow, JUA is so entitled.

### A.  Act 15 is unlawful

#### 1.  JUA has constitutional rights: it is a private entity possessed of private property; the state cannot alter that status with *post hoc* legislation such as Act 15.

The facts have not changed since this court's earlier decisions in *JUA I* and *JUA II*. JUA still operates in the same manner as it did then so the findings there apply equally here. What has changed from those earlier decisions is the way the Commonwealth seeks to take control of JUA's surplus. From Act 44's "give us $200,000,000" or dissolve and Act 41's press ganging JUA into the Insurance Department, the Commonwealth in Act 15 moves in a slightly more subtle but equally unconstitutional direction to gain control of JUA's surplus. Defendants took note of the characteristics JUA asserted, and this court agreed, support the conclusion that JUA is a private entity – lack of Commonwealth funding, private counsel, autonomous operation free from the various statutes that apply to state

agencies that receive taxpayer funding – and simply decreed that henceforth JUA will receive the "gift" of such funding and representation and be forced to comply with the statutes that apply to state-funded entities. The state cannot capture JUA in this way.

*JUA I* and *II* establish that JUA has constitutional rights. In *JUA I*, based on an examination of JUA's long history of autonomy separate from the state as a private association, the private source of its funding, including for its self-managed operations, and other characteristics that confirm its non-state status, the court struck down Act 44 of 2017's attempt to take $200 million of JUA's assets. It held JUA to be "a private entity," and the monies in its possession "private property." *Id*. at 539. In *JUA II,* based on *JUA I*'s holistic analysis of JUA's characteristics, the court struck down Act 41 of 2018's attempt to absorb JUA and its assets into the state. It confirmed that the Commonwealth cannot "recapture the Association through *post hoc* legislation—irrespective of private rights and interests accrued by the Association over more than four decades—without constitutional consequence." *JUA II* at 335, 343.

As the court has already recognized in this case, these holdings have direct bearing on the validity of Act 15's attempt to subject JUA to various existing statutes that apply only to governmental entities by mandating that JUA accept legislative appropriations, comply with Commonwealth budgeting processes,

locate its operations in a Commonwealth-owned building, assent to representation

by Commonwealth attorneys, and comply with a thicket of laws that apply to state

agencies dependent on the public fisc, involving procurements, meetings, and

records requirements:

> Our holdings in *JUA I* and *JUA II* stand for the threshold
> propositions that the Association is a private entity, its
> assets are private property, and the Fifth Amendment
> prohibits the Commonwealth from either directly or
> indirectly taking those assets for public use without just
> compensation. *See JUA I*, 324 F. Supp. 3d at 538; *JUA II*,
> 2018 WL 6617702, at *14. While *JUA I* and *JUA II* are
> not dispositive as to the new claims raised in this case, they
> are controlling as to these issues, and they confirm that
> there are limits to the Commonwealth's power over the
> Association.

*Pennsylvania Prof'l Liab. Joint Underwriting Ass'n v. Wolf*, 2019 WL 3216658

(M.D. Pa. 2019) (*JUA III*) at *5.

If permitted to stand, Act 15's many intrusions into JUA's private operations

will have the effect of altering the very characteristics the court found to be

determinative of JUA's private status in *JUA I* — autonomy, private control, and

financial independence from the state.  Just as the legislature cannot make JUA a

Commonwealth instrumentality simply by declaring it to be so in Act 44 of 2017,

*JUA I* at 529 n. 5,  or "recapture the Association through sweeping *post hoc*

legislation" that purports to make JUA and its assets part of the Insurance

Department as in Act 41 of 2018, *JUA II* at 343, it cannot in Act 15 of 2019 alter

JUA's private nature by stripping JUA of its autonomy across a range of characteristics, starting with its financial independence. Analyzed collectively, Act 15's provisions do just that: they rob JUA of its private identity, in violation of the Constitution. Analyzed individually, each of the restrictions or burdens imposed on JUA by Act 15 violates constitutional rights JUA possesses as a private entity.

**2. The collective impact of Act 15's subjection of JUA to statutes that apply only to state entities robs JUA of its private status, captures JUA and its private assets for the state, and deprives JUA of constitutional rights**

Central to the court's conclusion in *JUA I* that JUA is a private entity is JUA's establishment and long tenure under Pennsylvania law as a nonprofit association that is autonomous and financially independent. Forty-five years ago when the state sought to assure "availability of medical professional liability coverage throughout the Commonwealth," it chose to do so through JUA, "a private Association," that achieved "a public health objective" at "no public cost." *Id*. at 538. "The Association has never received Commonwealth funding," the court emphasized, *id*. at 537, operates as a nonprofit association under Pennsylvania law, *id*. at 538, is "at its core, an insurance company," *id*. at 535 and, although it was created by statute, "in the same legislation that created the Association, the General Assembly relinquished control thereof, for all material intents and purposes, to the Association's board of directors." *Id*. at 538.

In striking down Act 41's attempted absorption of JUA into the Insurance Department in *JUA II*, the court rejected the state's attempt to distinguish *JUA I* with the defense that, unlike Act 44, Act 41 "did not 'take' anything" from JUA because JUA would "continue to exist as a statutory entity within the Department, 'albeit as a new legislative manifestation,' such that 'the funds are not being taken by a new owner.'" *Id.* at 341. The court found dispositive that the statute purported to transfer "complete control of the Association to the Commonwealth," grant "ownership and authority over the Association's assets," and "dismantle[] a private entity as it currently exists." *Id.* Acknowledging the deference due the legislature to amend legislation to address changed priorities, the court reasoned that having chosen to create JUA as a private entity with independent existence, zero state funding, and virtually no state control, the state could not thereafter execute a hostile takeover of JUA:

> The General Assembly must be afforded a wide berth to enact and to amend legislation in furtherance of its preferred objectives. But when it chooses to create a private entity to meet those objectives, in which the state is not alone or, indeed, at all interested, and over which the state retains virtually no control, that legislative discretion is bounded by the federal Constitution. This is precisely the case with the Joint Underwriting Association. We hold that the Fifth Amendment prohibits the Commonwealth from taking the private assets of the Association, either directly as in Act 44 or through the hostile takeover effected by Act 41, without just compensation.

*Id.* at 341.

Seemingly milder in form than Acts 44 or 41, Act 15's provisions nonetheless similarly strike at the heart of JUA's financial independence and autonomy. Section 1502-B forces JUA to fund its operations through a legislative appropriation, thereby making JUA an "offer it can't refuse" that divests JUA of control over its own purse strings and strong-arms its way onto JUA's balance sheet and income statement.  Section 1503-B's related requirements to participate in the annual budget appropriation request process further involve the state in JUA's finances, limiting JUA's ability to retain control of its funds, including the surplus that the legislature to date has tried in vain to seize.  Similar to the forced budget appropriation, Section 1506-B(2)'s mandated relocation of JUA into state office space force-feeds JUA with an unwanted and unneeded expense-avoiding contribution in kind, further compromising JUA's financial independence, restricting JUA's discretion to choose the space in which to conduct its everyday affairs, and creating the public perception through compulsory occupancy in a state office building that JUA is the state. Section 1505-B(1)'s subjection of JUA to the Commonwealth Attorneys Act likewise foists upon JUA legal services it does not seek, need, or want from the Commonwealth, further restricting JUA's ability to provide the essence of the service its insureds pay premiums to receive, and denying JUA its constitutionally protected right to hire counsel of its choice. Finally, the commands of Sections 1504-B, 1505-B and 1506-B that JUA comply

with laws involving public access to Board meetings, records, and procurements that are otherwise applicable only to (mostly state agency) entities that are financially dependent on the government, presupposes power over a private entity the state lacks, further intrudes on and erodes JUA's discretion to conduct its own affairs, and creates the public perception that JUA is the state.

Viewed together, as they should be in light of Act 15's place in the relentless succession of legislative attempts to commandeer JUA's private assets, the provisions of Act 15 are a Trojan Horse – a proffered "gift" that has the insidious effect of eradicating the characteristics that defined JUA as a private entity in *JUA I* and *JUA II*. From a constitutional rights perspective, the collective provisions of Act 15 violate the Fifth Amendment Takings clause, the Contracts clause, and substantive due process.[3]

### a. Taking

"'The Fifth Amendment, made applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q. R. Co. v. Chicago,* 166 U.S. 226, 239 [ ] (1897), provides that 'private property' shall not 'be taken for public use, without just compensation.'" *Phillips v. Washington Legal Found.*, 524 U.S. 156, 163-64

---

[3] JUA addresses the provisions of Act 15 individually *infra* at Section C, including Section 1505-B (1)'s deprivation of JUA's right to counsel by subjecting JUA to the Commonwealth Attorneys Act.

(1998). Taken together, Act 15's provisions force JUA to surrender property, and, indeed, its identity as a private entity.

*JUA I*'s holding that Act 44 of 2017 worked an unconstitutional taking is premised on the "threshold propositions that [JUA] is a private entity" and "its assets are private property." *JUA III* at *5. To demonstrate in *JUA I* that JUA is a private entity, JUA recounted and the court relied on undisputed facts concerning its history and operations, including that:

- the Commonwealth does not fund and has never funded any of JUA's operations, but rather JUA has always been funded solely by policyholder premiums and investment income and returns (*JUA I*, Doc. 80 Nos. 51, 54);

- JUA leases its own real estate, and in doing so does not use the Department of General Services to assist or oversee its lease transactions (*id*. No. 73);

- JUA has always retained its own lawyers and never has been represented or required to be represented by Commonwealth lawyers (*id*. Nos. 83-85);

- JUA does not follow the Right-to-Know Law and never has been required to do so (*id*. Nos. 77-78);

- JUA does not follow the Sunshine Act and never has been required to

do so (*id*. Nos. 80-81); and

- JUA does its own procurements, and in doing so does not use the Department of General Services or any other Commonwealth agency to assist or oversee the procurements, and never has followed or been required to follow the Procurement Code (*id*. Nos. 74-76).

If this recital of attributes that establish JUA's status as a private entity that is possessed of private property separate and apart from the state has a familiar ring, it is because the provisions of Act 15 target and purport to reverse each attribute. Act 15's "gifts" that JUA is forced to accept – taxpayer funding of operations through an annual appropriation, taxpayer funding of office space, and taxpayer funding of legal representation – put an end to JUA's 45-year history of autonomy and complete financial independence from the state, which is the cornerstone of JUA's private status. Act 15's other provisions that impose obligations otherwise applicable only to government and other entities that are financially dependent on taxpayer funding similarly upend decades-long indicators of JUA's private entity status. Together, Act 15's provisions are a *post hoc* package of legislative changes that materially alter JUA's private entity status and provide the state with an uninvited stake in, and control over, JUA's existing assets.

*State funding*

Since its inception, JUA's funds have come exclusively from its private business – premiums received for risk taken in the private insurance market, and from investment returns on net income from those premiums. *JUA I* at 537-538. The state has never provided JUA funding of any kind. *Id*. By mandating that JUA "shall be funded through appropriations[4] determined by the General Assembly" (Section 1502-B), mandating that taxpayers will henceforth pay for JUA's office space (Section 1506-B(2)), and mandating that taxpayers will henceforth pay for the lawyer services JUA uses (Section 1505-B(1)), Act 15 robs JUA of its financial independence going forward, and necessarily provides the state with an ownership interest in JUA and its assets. *See JUA I* at 537 (explaining that courts apply "a variety of factors including … the nature of the funds implicated" to determine an entity's relationship with the state and noting that "[t]he Association has never received Commonwealth funding" in concluding that JUA's surplus is private property); *Arroyo-Melecio v. Puerto Rico American Insurance Co.*, 398 F.3d 56, 61-63 (1st Cir. 2005) (holding that an association was not a governmental entity

---

[4] "Our Supreme Court defines 'appropriation' to mean 'a designation of money raised by taxation to be withdrawn from the public treasury for a specifically designated purpose.' *Shapp v. Sloan,* 391 A.2d 595, 603 (Pa. 1978), *appeal dismissed sub nom. Thornburgh v. Casey,* 440 U.S. 942 (1979) (citations omitted)." *County of Mercer v. Amundsen*, 879 A.2d 366, 369 (Pa. Cmwlth. 2005) (en banc).

because, *inter alia*, the association's members, not the government, shared in its profits and losses and bore its insurance risk alone); *Texas Catastrophe Prop. Ins. Ass'n v. Morales*, 975 F.2d 1178, 1183 (5th Cir. 1992) (*Morales*) (considering the State of Texas's interest in the association's assets to determine that insurance association was not an arm of the state). This type of forced investment into an already-thriving going concern that needs no financial assistance seizes for the state a valuable interest in JUA and its assets that JUA would not give voluntarily, and simultaneously eliminates key indicia of JUA's private status. Stated differently, it is both an immediate taking, and an ongoing taking in the making. *See* Sersha Dec. at ¶ 20 ("Over time, the accumulated additional surplus attributable to state appropriations and investment income thereon, as reflected on JUA's balance sheet, will become a larger and larger percentage of JUA's surplus.").

### State control over JUA's existing funds

These same provisions, together with Section 1503-B's budget process directives, also allow the state to dictate the amount JUA is permitted to spend from its own existing funds. Section 1502-B's directive that "the operations" of JUA "shall be funded" through "appropriations determined by the General Assembly" by its terms prohibits the use of funds other than those the legislature decides to appropriate for JUA; were it otherwise, the legislature would have used

words to convey that JUA is permitted to look to sources other than the

appropriation to supplement the funding of its operations.[5]

Section 1503-B, in turn, lays out the process pursuant to which the

legislature will determine the appropriation it will give JUA to fund its operations.

JUA first must "submit written estimates" of the funds it needs to carry out its

programs as required of all state agencies under Section 615 of the Administrative

Code. Section 1503-B (A). JUA must then appear before legislative committees in

both chambers to testify about its estimate, Section 1503-B (B)(1), and then appear

before the respective appropriations committees to testify about its fiscal status and

justify its appropriation amount. Section 1503-B (B)(1)(2). Section 615 (a) of the

---

[5] *See, e.g., Rotkiske v. Klemm*, 890 F.3d 422, 425 (3d Cir. 2018), *aff'd*, 140 S. Ct. 355 (2019) (affirming district court's refusal "to imply a discovery rule" for commencement of an action based on plain language of the statute, which provided for commencement "within one year from the date on which the violation occurs".); *Fletcher v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n*, 914 A.2d 477, 481 (Pa. Cmwlth. 2007), *aff'd*, 985 A.2d 678 (Pa. 2009) ("Under the principle of statutory construction *expresio unius est exclusio alterius* (the mention of one thing in a statute implies the exclusion of others not expressed), the MCARE Act's failure to include an express administrative appeal provision for coverage disputes implies none was intended and, as such, the legislature intended these disputes remain in this Court's original jurisdiction."); *Dana Corp. v. W.C.A.B. (Beck)*, 782 A.2d 1111, 1113 (Pa. Cmwlth. 2001) (refusing to interpret statutory provision broadly to include all other benefits paid as a result of unemployment although "the statute did not specifically limit itself to benefits paid under the Unemployment Compensation Law," reasoning that "[t]o the contrary, had the legislature intended section 204(a) to include supplemental benefits paid through a union contract or some other source, it would have said so.").

Administrative Code requires agencies to disclose existing funds from all sources and Section 615 (b) prohibits agencies from expending funds from any source in excess of the appropriation amount.[6]

Although Section 1503-B (A) does not expressly incorporate by reference all provisions of Section 615, when read in context with Section 1502-B's directive that "[n]otwithstanding any provision of law to the contrary, the operations of [JUA] shall be funded through appropriations determined by the General Assembly," the "accountability" title of the JUA provisions in Act 15 ("Joint Underwriting Association Accountability"),[7] and the fiscal notes that informed the legislature's consideration of Act 15 concerning the JUA provisions ( [Act 15] "[e]stablishes… JUA… as a Commonwealth agency, requires the operations of the JUA be funded through an appropriation"),[8] no other conclusion is plausible. Act

---

[6] 71 P.S. § 235(b): "After the approval of any such estimate, it shall be unlawful for the department, board, or commission to expend any appropriation, Federal funds or funds from other sources or part thereof, except in accordance with such estimate and the authorized complement level, unless the same be revised with the approval of the Secretary of the Budget and within the limits appropriated by the General Assembly."

[7] The title of a statute may be considered in construing it.  1 Pa. C.S. § 1924; *Department of Envtl. Res. v. Butler Cnty. Mushroom Farm*, 454 A.2d 1, 4 n. 4 (Pa. 1982).

[8] "**Joint Underwriting Association Accountability**

Establishes Joint Underwriting Association (JUA) as a Commonwealth agency, requires the operations of the JUA be funded through an appropriation, and

15 treats JUA's appropriation as a mandatory ceiling on its expenditures, just as with the Commonwealth agencies with which JUA now has been lumped. This, too, is a taking.  Through its role in earning, administering, conserving, and investing its existing surplus, JUA has rights to its "possession, control and disposition," which are "valuable rights that inhere in the property." *Phillips,* 524 U.S. at 169–70. Under Act 15, these rights are removed or, at a minimum, materially impaired.

### *State agency indicia*

Act 15's other impositions on JUA – requiring JUA to comply with the Commonwealth Attorneys Act,[9] the Right-to-Know Law,[10] the Sunshine Act,[11] the Pennsylvania Web Accountability and Transparency (PennWATCH) Act,[12] the Commonwealth Procurement Code,[13] and the Department of Revenue's standards on handling federal tax information, all of which find their nominal justification in the fact that JUA is now subsidized by the state, work collectively to undermine

---

requires the JUA to perform various requirements as a state agency." Sersha Dec., Ex. 3 (Fiscal Notes) at 4, 7.

[9] 71 P.S. §§ 732-101 – 732.504.

[10] 65 P.S. §§ 67.101 – 67.3104.

[11] 65 P.S. §§ 701 – 716.

[12] 72 P.S. §§ 4664.1 – 4664.6.

[13] 62 Pa. C.S. §§ 101 – 4509.

JUA's status as a private entity. *See, e.g., Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.*, 880 F.3d 643, 657 (3d Cir.), cert. denied, 139 S. Ct. 167 (2018) (noting that Pennsylvania State System of Higher Education was subject to state administrative procedure and civil service laws, including Commonwealth Attorneys Act, to conclude that PSSHE was part of the state); *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.,* 908 F. Supp.2d 597, 612 (M.D. Pa. 2012) (in finding that state funded charter school was part of the state, court noted that charter schools were subject to Right-to-Know Law); *see also, Morales*, 975 F.2d at 1186 (dissenter opined that JUA-like entity's statutory requirement to comply with Texas open meeting law indicated that entity was public not private). In conjunction with state funding of JUA's operations and state control over JUA's use of its existing funds, subjecting JUA to statutes designed to make taxpayer-funded entities accountable diminishes JUA's autonomy and enhances the claims that JUA is the state and its funds are the state's funds. These provisions thus are part of the taking because in *post hoc* fashion they simultaneously flow from and support the proposition that a state funded JUA is no longer a private entity possessed of private property.

### b.  Contracts clause

"The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S.Ct. 1815, 1821 (2018). It provides that "[n]o

State shall ... pass any ... Law impairing the Obligation of Contracts ....” U.S.

Const. art. I, § 10, cl. 1.   Courts apply a two-step test to determine whether a state

law violates the Contracts Clause. *Sveen*, 138 S.Ct. at 1817. The threshold inquiry

is whether the state law has “operated as a substantial impairment of a contractual

relationship.” *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). In

answering that question, courts consider “the extent to which the law undermines

the contractual bargain, interferes with a party's reasonable expectations, and

prevents the party from safeguarding or reinstating his rights.” *Sveen*, 138 S.Ct. at

1822; *Watters v. Bd. of Sch. Directors of City of Scranton*, 400 F. Supp. 3d 117,

133 (M.D. Pa. 2019); *see United Steel Paper & Forestry Rubber Mfg. Allied Indus.

& Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d

201, 210 (3d Cir. 2016) (“To assess whether there has been an impairment of a

contractual relationship, we ask whether legitimate expectations have been

thwarted.”). “If such factors show a substantial impairment, the inquiry turns to the

means and ends of the legislation. In particular, the Court has asked whether the

state law is drawn in an ‘appropriate’ and ‘reasonable’ way to advance ‘a

significant and legitimate public purpose.’” *Sveen,* 138 S.Ct. at 1822 (quoting

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411-412

(1983)). “Total destruction of contractual expectations is not necessary for a

finding of substantial impairment.” *Energy Reserves Grp., Inc.*, 459 U.S. at 411.

JUA's Plan is a contractual agreement between JUA as a private, independent entity and its members, and between and among JUA's members;[14] it governs JUA's affairs, management, and disposition of JUA's private property. [15] The decision as to content of the Plan is delegated to JUA's members, subject only to the Insurance Commissioner's approval. 40 P.S. § 1303.731. Provisions of the Plan approved long ago by the Commissioner provide expansively that JUA's Board "shall decide all matters of policy and have authority to exercise all reasonable and necessary powers relating to the operation of [JUA] which are not specifically delegated by this Plan to others or reserved to the members of the Association.[16] The Plan provides specifically that JUA's Board "shall be empowered to invest…, borrow and disburse funds, budget expenses, levy assessments, receive contributions, reinsure liabilities of the Association and perform all other duties necessary or incidental to the proper administration of this Plan."[17]

---

[14] To the extent bylaws affect the property rights of members *inter se*, they are contractual in nature. *Bechtold v. Coleman Realty Co.*, 79 A.2d 661, 663 (Pa. 1951). JUA's Plan of Operations conveys meaningful promises between and among JUA's members and between and among the members and JUA as an entity independent of its members.

[15] JUA Facts at ¶¶ 3-7.

[16] JUA Facts at ¶ 7; Sersha Dec., Ex. 1 (Plan), Art. VI, Sec. 1 & Art. VII.

[17] Sersha Dec., Ex. 1 (Plan), Art. VII, Sec. 2.

By unilaterally requiring JUA to fund its operations through a state appropriation developed in accordance with state budgeting procedures that cap expenditures at the level of the appropriation, relocate its offices to a Commonwealth-owned building, obtain legal counsel and representation from Commonwealth attorneys, open a portion of its Board meetings to the public, disclose its records under the Right-to-Know Law, acquire goods and services in accordance with the Commonwealth Procurement Code, comply with PennWATCH's requirements to display on the Web how JUA's government money is being spent, and comply with federal tax information handling requirements applicable only to governmental entities, Act 15 eliminates or significantly curtails the broad discretion invested by the Plan in JUA's Board, and divests the Board of its ability to manage key elements of JUA's affairs.  These dictates and intrusions plainly interfere in a material way with the reasonable expectations of JUA's members when they committed to the Plan that governs JUA.

Despite the cloak of "accountability" the legislature has draped over Act 15's JUA provisions, none of the many interferences with JUA's Plan is an "'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,'" *Sveen,* 138 S.Ct. at 1822, concerning a private entity such as JUA. Accepting, *arguendo*, that JUA's fiscal and managerial "accountability" to

taxpayers is a legitimate public purpose – a premise hard to accept given that JUA is a private entity whose property is private – the Court must "decide whether the impairment of JUA's Plan is both necessary and reasonable to meet the purpose advanced by the Government in justification." *United Steel Paper*, 842 F.3d at 211. It is not.

As the court has held, JUA is a private entity that is "at its core, an insurance company," *JUA I* at 535, and "no more a Commonwealth entity 'than any other private insurer authorized to write insurance in the state.'" *JUA II* at 333, quoting *JUA I* at 537.  As a  private insurer, however,  JUA is already highly "accountable" to the state – the rates it charges its insureds are subject to regulation, its surplus is closely monitored for sufficiency, the Insurance Commissioner has broad authority to audit JUA and inspect its books and records, and it is required to file detailed quarterly and annual reports that reveal its reserve and surplus.[18] Under these circumstances, additional accountability measures are an unreasonable interference because they are superfluous – all of the tools the state needs to secure accountability are already in place.  Even if it were necessary to single out JUA for

---

[18] *See* 40 P.S. § 1303.731(b)(2) (requiring JUA to "[s]ubmit rates and any rate modification to the department for approval in accordance with the act of June 11, 1947 (P.L. 538, No. 246), known as The Casualty and Surety Rate Regulatory Act."), § 1303.712(f) (requiring annual rate filings); 31 Pa. Code §§ 147.1-147.14 (financial reporting requirements), § 242.13 (audits).

additional accountability measures, those chosen – foisting on JUA an

appropriation it neither wants nor needs, requiring  it to reside in Commonwealth

office space, requiring it to use Commonwealth lawyers, and compliance with

Commonwealth agency transparency statutes – are not reasonable means to

achieve accountability at the cost of disrupting the contractual expectations of

autonomy and financial independence at stake in JUA's Plan. In sum, the "severe

disruption of contractual expectations [created by Act 15] was [not] necessary to

meet an important general social problem[, so t]he presumption favoring legislative

judgment as to the necessity and reasonableness of a particular measure, simply

cannot stand in this case." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234,

247 (1978) (quotation and citation omitted).

### c.  Substantive due process

The Due Process Clause of the United States Constitution provides that no

person shall be "deprived of life, liberty, or property, without due process of law."

U.S. Const. Amend. XIV, § 1.  JUA's right as a private entity to engage in its

business of selling MPL insurance without unreasonable government interference

is guaranteed under the Fourteenth Amendment. *Greene v. McElroy*, 360 U.S. 474,

492 (1959); *Meier v. Anderson*, 692 F. Supp. 546, 551-552 (E.D. Pa. 1988). Laws

that burden that right will be struck down if they are not rationally related to a

legitimate government interest. *Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014).

Although "rational basis review allows legislative choices considerable latitude," and "[a] governmental interest that is asserted to defend against a substantive due process challenge need only be plausible to pass constitutional muster," rational basis review "is by no means 'toothless'—[a] necessary corollary to and implication of rationality as a test is that there will be situations where proffered reasons are not rational." *Id., citing Doe v. Pa. Bd. of Prob. & Parole,* 513 F.3d 95, 112 n. 9 (3d Cir. 2008).

Applying this standard to the undisputed facts, the collective provisions of Act 15 are not rational because they serve no plausible government interest.  At the threshold, the implausibility and irrationality of Act 15's provisions as they apply to JUA are betrayed by the statute's declared purpose, which is: "to provide for the administration of the 2019-2020 Commonwealth budget." Act 15 Section 1 (1). "Every provision of the Act," the General Assembly found, "relates to the administrative implementation of the operating budget of the Commonwealth for *this fiscal year*, addressing in various ways the administrative operations and potential liabilities of the Commonwealth for *this fiscal year*." *Id*. at (7) (emphasis added).  However, none of the provisions in Act 15 affecting JUA, enacted June 28, 2019 and effective immediately, has any connection to the 2019-2020 Commonwealth budget. The FY 2019-2020 budget runs from July 1, 2019 through June 30, 2020. 72 P.S. § 1804 (effective date).  No funds were appropriated for

JUA in that budget.  No Act 15-prescribed budget preparatory estimates, hearings or other activities occurred or were possible for a budget that went into effect two days after Act 15 was signed into law. Nor do any of Act15's other obligations imposed on JUA have any relation to the FY 2019-2020 budget. The legislative findings that support Act 15 thus provide no support whatever to Act 15's JUA provisions.

Irrationality of the legislature's proffered plausibility justification for Act 15's JUA provisions aside, however, there is no rational basis for any of the provisions in Act 15 as applied to JUA.  JUA is a private entity virtually indistinguishable from other private insurance companies.  *JUA II* at 333. Nevertheless, all of Act 15's provisions single out JUA and treat it as if it were part of the state, requiring JUA to comply with statutes that otherwise apply only to governmental entities.  All of Act 15's JUA provisions infringe on JUA's right to conduct its private business as its Board chooses and undermine JUA's autonomy. The only possible legitimate justification for interfering in this manner with a private entity is to prevent JUA from failing in its work of assuring availability of MPL insurance; given the undisputed facts, however, that justification lacks rationality.  The state has attempted unsuccessfully to gain control of JUA's assets in successive statutes enacted since 2016, based on a claim that JUA has "excess" surplus; with that history, there can be no credible

justification that JUA needs to be protected from failing as an enterprise.
Regardless, a comprehensive regime of regulation by the Insurance Department
already exists, including risk-based capital requirements designed to provide an
early warning about and rehabilitation for insurers that experience financial
difficulty.[19]  Obviously, JUA is not compromised financially, so Act 15's
requirements that JUA accept a state appropriation for its operations, state office
space for its headquarters and state lawyers for its legal needs have no plausible
basis in financial need. As for the requirements that JUA comply with the various
public access and accountability statutes Act 15 imposes, interference of this type
could possibly be justified if JUA were state-funded, but otherwise is precisely
the type of exercise of arbitrary legislative authority that the Fourteenth
Amendment prohibits. If the state may interfere with a private entity in the way
Act 15 treats JUA, any commandeering of the rights of any private entity at any
time could be justified. Such actions, regardless of purpose, are beyond the
Commonwealth's power. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393,

---

[19] *See, e.g.,* 40 P.S. § 221.2-A (Requiring domestic insurers to file annual Risk
Based Capital (RBC) reports with the Insurance Department), §§ 221.6-A – 221.9-
A (Outlining procedures for insurers reporting insufficient RBC levels, including,
but not limited to: preparation of an RBC Plan; performance of examinations and
analyses; and implementation of corrective actions as required by the
Commissioner.), §§ 221.14 – 221.16 (Providing grounds and procedures for
rehabilitation of insolvent or financially hazardous insurers).

416 (1922) ("strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way"); *JUA II* at *15 ("…as we have stated both in this case and its predecessor, the Commonwealth cannot achieve a legitimate end through unconstitutional means."). In light of *JUA I* and *JUA II*'s preclusive holdings, the entirety of Section 7 of Act 15 is an irrational and unjustified overreach into a private entity that offends substantive due process.

### 3. The individual impact of each of the statutes Act 15 imposes on JUA violates JUA's constitutional rights

As discussed above, the individual provisions of Act 15 work together in overlapping ways to deprive JUA of constitutional rights to which JUA as a private entity is entitled; they therefore should be viewed collectively and enjoined as a group. Analyzed individually, however, the provisions are equally constitutionally repugnant.[20]

### a. Subjection to mandatory appropriation to fund operations

Section 1502-B of Act 15 provides that "[n]otwithstanding any provision of law to the contrary, the operations of [JUA] shall be funded through appropriations

---

[20] The following provision-by-provision discussion of the 10 requirements imposed by Act 15 proceeds in Act 15's chronological sequence, beginning with Section 1502-B and proceeding through Section 1506-B(3).

determined by the General Assembly." Although defendants have touted this provision as "giving" to JUA, it is in reality a taking. As explained *supra* at argument A.2.a., forcing JUA to accept an annual appropriation of taxpayer money it neither wants nor needs to cover the cost of its operations robs JUA of its financial independence going forward, and necessarily provides the state with what amounts to an immediate financial stake in JUA and its assets.

It also deprives JUA's Board of its contractual right under the Plan to accept or reject contributions; given JUA's robust financial status, that override of JUA's and its members' contractual rights has no imaginable legitimate public purpose, in violation of the Contracts clause. *See supra*, argument A.2.b.

For the same reasons, a forced appropriation violates JUA's right to substantive due process, because it fundamentally interferes with JUA's conduct of its business by erasing JUA's identity as a private nonprofit entity and making it a ward of the state, without any rational basis. That irrational interference is compounded by the fact that a state appropriation undermines JUA's intended role in the market to provide MPL insurance to those who "cannot conveniently obtain" it "through ordinary methods." 40 P.S. § 1303.732(a). Actuarial principles require JUA to reduce the expense component of its rates by the amount of the appropriation it receives, which in turn will decrease JUA's rates and thereby increase its market share. *See* Sersha Dec. at ¶¶ 21-24. Rational basis review "is

by no means 'toothless'—[a] necessary corollary to and implication of rationality as a test is that there will be situations where proffered reasons are not rational." *Heffner*, 745 F.3d at 79.

### b. Subjection to Section 615 of the Administrative Code

Section 1503-B of Act 15 provides that JUA "shall submit written estimates to the Secretary of the Budget as required of administrative departments, boards and commissions under Section 615," and imposes other obligations to appear before committees of both chambers to make and support its budget request. The written estimate "required under Section 615" that is incorporated into Section 1503-B is part of a regimented state budgeting process that exerts tight control over all of the estimating entity's expenditure of funds. Section 615, 71 P.S. § 235. Under Section 615, the estimate required by Section 1503-B is offered "for approval or disapproval" by the Secretary, and must include "[a]ll available Federal funds or funds from other sources." *Id.* If disapproved the estimate must be "revised as necessary and resubmitted for approval." *Id.* Once approved, "it shall be unlawful for the [agency] to expend any appropriation, Federal funds or funds from other sources" unless approved by the Secretary and within the limits appropriated by the General Assembly." *Id.*

These provisions impose a level of control over JUA's funds that results in a taking. Although defendants have argued that Section 1503-B requires only the

submission of an estimate by JUA, and does not impose any of Section 615's other onerous provisions, that interpretation ignores other provisions of Act 15 that, taken together, confirm a clear intent to require JUA to accept and operate under an appropriation that demands pre-approval of, and a mandatory ceiling on, JUA's expenditures, in the same way that state "administrative departments, boards and commissions" must operate.  Section 1502-B, for example, minces no words in restricting use of funds: "[n]otwithstanding any provision of law to the contrary, the operations of [JUA] shall be funded through appropriations determined by the General Assembly." Section 1503-B (B)(2) requires JUA to appear annually before the Senate and House appropriations committees to "make requests for appropriations." And of course, the title of the JUA provisions in Act 15 is "accountability," and the fiscal notes that accompanied its consideration explained that the legislation "[e]stablishes …JUA… as a Commonwealth agency." Given that Section 1503-B's incorporation of Section 615 is clear from the plain words, and that "we must always read the words of a statute in context and not in isolation, and give meaning to every provision," *Gavin v. Loeffelbein*, 205 A.3d 1209, 1221 (Pa. 2019), it is clear that Section 1503-B results in the state's controlling, and thus unconstitutionally taking, the same assets the court decided deserve protection in *JUA I* and *JUA II*. "[P]ossession, control and disposition," are "valuable rights that inhere in the property." *Phillips,* 524 U.S. at 169–70.

Section 1503-B's subjection of JUA to the state budget process also runs afoul of the Contracts clause and substantive due process, for the same reasons explained with respect to Section 1502-B's forced acceptance of an appropriation.

### c. Subjection to the Open Meeting Law

Section 1504-B of Act 15 provides that JUA's Board must hold quarterly public meetings "subject to the requirements of 65 Pa. C.S. Ch.7 [the Open Meetings Law] to discuss JUA's "actuarial and fiscal status." This imposition on JUA's sovereignty and private operations offends the Contracts clause and JUA's substantive due process rights. The court already has decided the threshold issue as to each – although JUA's operations "work an incidental public benefit," its function is private, not public:

> The Association's function is inherently private. It is, at its core, an insurance company. The Association is comprised of private insurer members, governed by a private board, and supported by private employees. It is funded by privately paid premiums and is tasked to provide medical malpractice coverage to private persons practicing medicine within the Commonwealth. It does not "exist wholly to serve the State," nor is it engaged in work otherwise tasked by statute to the state's insurance commissioner. … That the Association's private operations work an incidental public benefit does not render its function a public one.

*JUA I* at 535-536.

For Contracts Clause purposes, JUA's Plan vests total managerial discretion in the Board; the open meeting requirement encroaches on that discretion, as JUA's Board has never held any portion of its meetings publicly, but now is required to do so. *See* JUA Facts at ¶¶ 7, 42-45. To pass muster, such an interference with a private entity's contract must be an "'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen,* 138 S.Ct. at 1822. Given that JUA's nonprofit function is inherently private, not public, however, there can be no legitimate public purpose in opening its meetings to the public. To the extent public scrutiny of JUA's "actuarial and fiscal status" could be deemed a legitimate public purpose because JUA's "private operations work an incidental public benefit," subjecting JUA to the Open Meeting Law is not an appropriate or reasonable way to advance that goal, because JUA already publicly discloses information concerning its actuarial and fiscal status in quarterly and annual filings with the Insurance Commissioner.[21] JUA Facts at ¶ 46; Sersha Dec. at ¶ 33.

---

[21] In addition to publicly accessible online databases, the Insurance Department's Public Documents Room maintains hardcopy records of insurance company filings, including JUA's insurance rate and policy form filings and financial statements, which are available for public review and copying. Pennsylvania Insurance Department, *How to Examine or Receive Copies of Public Documents*, available at https://www.insurance.pa.gov/Pages/PublicDocuments.aspx.

The same analysis yields a substantive due process violation from Act 15's imposition of the open meeting requirement: there is no plausible government interest that justifies singling out JUA separate from all other MPL insurers for such an intrusion into a private entity's operations. *See Heffner*, 745 F.3d at 79.

*Harristown Development Corp. v. Dept. of General Services*, 614 A.2d 1128 (Pa. 1992), relied on unsuccessfully by the defendants in *JUA I*, does not suggest or support a different result. There, a state statute subjected nonprofit corporations that lease property with a rental value of more than $1,500,000 to the Commonwealth to the Sunshine Act and the Right-to-Know Law. The court rejected the challenge of Harristown, the only affected lessor, holding that the statute did not violate equal protection, due process, or the Contracts clause, but based on very different circumstances than those here. As to rational basis, the court found that Harristown's position as the largest supplier of rented space to the Commonwealth provided sufficient basis for the Commonwealth to "monitor the soundness of Harristown's business operations." *Id*. at 1132. As to the Contracts clause, the leases at issue there contained a provision that required adherence to all present and future laws. *Id*. at 1133. Here, however, unlike Harristown, JUA has no contractual obligation to the state, and even if a plausible similar concern about JUA's financial standing existed, the state already monitors and heavily regulates JUA's financial status as a private insurer under the insurance laws; the rational

basis found to exist in *Harristown* is absent here. Nor is there a basis here to excuse upending of JUA's Plan, the contract between and among JUA and its members. Although JUA's Plan states that JUA "is being carried on pursuant to the [MCARE] Act (as the same may be amended or superseded from time to time…),"[22] that language is not preemptive acquiescence in unlawful statutory changes. *JUA I* and *JUA II* stand for nothing if not the proposition that the state is prohibited from amending the laws that affect JUA in a manner that violates JUA's constitutional rights.

At bottom, the Sunshine Act requirement, like the other taxpayer access statutes imposed on JUA by Act 15 discussed below, can be justified only if JUA is financially dependent upon the state; as argued above, however, the state cannot force JUA to accept financial dependence.

### d. Subjection to the Commonwealth Attorneys Act

Section 1505-B (1) of Act 15 provides that JUA "shall be considered a Commonwealth agency for purposes of … the Commonwealth Attorneys Act." This deprives JUA of its counsel of choice. Specifically, the Commonwealth Attorneys Act provides: "[t]he Attorney General shall represent [JUA]… in any action brought by or against [JUA] and may intervene in any other action," and

---

[22] Sersha Dec., Ex. 1 (Plan), Art. I.

that "upon determining that it is more efficient or otherwise is in the best interest of the Commonwealth, authorize the General Counsel" to "initiate, conduct or defend any particular litigation or category of litigation in his stead." 71 P.S. § 732-204(c). As a private entity, however, JUA has a First Amendment and procedural due process right to hire counsel of its choice to represent it in civil litigation.

Freedom of speech and the right of association, protected by the First Amendment as applied to the states, includes the right to retain and consult with an attorney. *See generally United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217 (1967); *Ober v. Miller*, No. 1:04-CV-1669, 2007 WL 4443256, at *14 (M.D. Pa. Dec. 18, 2007), *aff'd*, 395 F. App'x 849 (3d Cir. 2010) ("The First Amendment's right to petition the government for redress of grievances extends to the 'right to hire and consult an attorney.'"); *Cipriani v. Lycoming Cnty. Hous. Auth.*, 177 F. Supp. 2d 303, 323–24 (M.D. Pa. 2001) ("'In sum, the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter.'"), *quoting Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000).[23]

---

[23] *See Whittington v. Maes*, 655 F. App'x 691, 698 (10th Cir. 2016) (acknowledging that while "[n]o one has a constitutional right to appointed counsel in civil cases," Plaintiff's "right to retain and consult with an attorney ... implicates ... clearly established First Amendment rights of association and free speech."), *citing Durre v. Dempsey*, 869 F.2d 543, 547 (10th Cir. 1989) and *DeLoach v.*

Procedural due process, guaranteed by the Fourteenth Amendment, likewise has been held to provide a basis for the right to retain counsel in judicial proceedings. *Goldberg v. Kelly*, 397 U.S. 254, 270–71 (1970) ("'The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.'"), *quoting Powell v. Alabama*, 287 U.S. 45, 68-69 (1932); *United States v. Flanagan,* 679 F.2d 1072, 1118 (3d Cir.1982), *rev'd on other grounds*, 465 U.S. 259 (1984) (construing *Powell,* 287 U.S. at 69); *see Guajardo-Palma v. Martinson*, 622 F.3d 801, 803 (7th Cir. 2010) (although a prisoner "does not have a constitutional right to a lawyer in a civil case [or] even a civil case such as a habeas corpus proceeding that challenges a criminal judgment," under *Powell*, the right to retain counsel is protected under the due process clause.). The right to counsel includes the right to choose the lawyer who will provide that representation. *Flanagan*, 679 F.2d at 1075 ("Where the right to counsel exists, the due process clause of the fifth amendment does provide some protection for the

---

*Bevers*, 922 F.2d 618, 620 (10th Cir. 1990); *Hart v. Gaioni*, 261 F. App'x 66, 67 (9th Cir. 2007) ("Civil litigants have a First Amendment right to be represented by counsel of choice free from unreasonable government interference with the attorney-client relationship."), *citing Board of R.R. Trainmen v. Virginia*, 377 U.S. 1, 7-8 (1964) (holding that an injunction restraining a railroad brotherhood organization from maintaining and carrying out plan for advising injured workers to obtain legal advice and for recommending specific lawyers denied members' rights guaranteed by First and Fourteenth Amendments).

decision to select a particular attorney."); *see Morales*, 975 F.2d at 1181 (finding statute forcing private insurance association similar to JUA to accept representation by Texas Attorney General violated association's due process right to counsel).

JUA's primary need for legal services relates to its obligation to provide a legal defense for its insureds, and its practice since inception has been to select private counsel for that purpose. JUA Facts at ¶ 51; Sersha Dec. at ¶ 38. By purporting to make JUA subject to the Commonwealth Attorneys Act, Act 15 forces JUA, a private entity, to forego counsel of choice and rely on the representation of the Attorney General, the General Counsel, or private counsel selected by them on JUA's behalf, *see, e.g.*, 4 Pa. Code §§ 1.801- 806 (agency hiring of non-Commonwealth lawyers subject to General Counsel approval), to fulfill this primary obligation to its insureds. The closest analog to the situation presented here is the Fifth Circuit's decision in *Morales*, familiar to this litigation from *JUA I* and *JUA II.* As the court summarized in *JUA I* at 533, the *Morales* court found the JUA-like entity in that case, an association that pursuant to state statute provided wind and hailstorm damage insurance, to be a private entity, and therefore struck down on due process grounds a state statute that declared the association to be part of the state and purported to require the association to use the

state attorney general for representation. 975 F.2d at 1180-1181. The same result should obtain here, either on First or Fourteenth Amendment grounds.[24]

JUA also has an ongoing need for advice and representation from corporate and regulatory counsel, and a periodic need for litigation counsel in matters involving its own business affairs, such as the present case(s).  JUA Facts at ¶¶ 52-54; Sersha Dec. at ¶¶ 39-41.  JUA's practice since inception has been to retain private counsel of its choice for these purposes. *Id.* Act 15's dictate that JUA be deprived of its choice of counsel for these needs is likewise constitutionally offensive, and for the same reasons.

Forcing JUA to accept Commonwealth counsel also: (1) contributes to Act 15's taking because it undermines JUA's financial independence, *see, supra*

---

[24] In *Kentucky W. Va. Gas Co. v. Pa. Pub. Util. Comm'n,* 837 F.2d 600, 618 (3d Cir.), *cert. denied,* 488 U.S. 941(1988), in the context of a challenge to a PUC decision requiring a natural gas local distribution company to be represented by independent counsel in its affiliated interstate pipeline supplier's FERC rate proceedings in order to protect the local distribution company's ratepayers from counsel's divided loyalties and assure vigorous advocacy against pipeline rate increases, the Third Circuit observed that "[t]he Supreme Court has not recognized a constitutional right to counsel in a civil case....", and went on to find no constitutional error in the PUC's decision under the facts of that case. Neither that observation nor the holding in the case, however, conflict with the established principle that "'the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter.'" *Cipriani,* 177 F. Supp. at 323-324.

argument A.2.a.; (2) violates the Contracts clause, *see, supra* argument A.2.b; and (3) violates JUA's substantive due process rights. *See, supra* argument A.2.c. In addition to irrationally forcing a private entity to utilize state lawyers, subjecting JUA to the Commonwealth Attorneys Act adds a redundant layer of contract review and impairs JUA's ability to timely respond to market crises in contracting to supply MPL insurance by imposing a 30-day advance review period by the Attorney General of "all Commonwealth …contracts to be executed by Commonwealth agencies."  71 P.S. § 732-204 (f).  *See* JUA Facts at ¶ 59-61; Sersha Dec. at ¶¶ 46-48 (explaining historical circumstances in which Attorney General review would have stymied JUA's ability to respond to a market crisis).

Put simply, Act 15's requirement that JUA, a private entity, use Commonwealth lawyers instead of hiring its own counsel of choice, deprives JUA of fundamental constitutional rights.  It cannot withstand scrutiny.

### e.  Subjection to the Right-To-Know Law

Section 1505-B (2) of Act 15 provides that JUA "shall be considered a Commonwealth agency for purposes of … the Right-To-Know Law." For all of the reasons explained with respect to Act 15's subjection of JUA to the Sunshine Act, *see supra* argument A.3.c., this imposition on JUA's sovereignty and private operations offends the Contracts clause and JUA's substantive due process rights.

JUA is a private entity. Its records are private records. To the extent the state or the public have a legitimate interest in those records, it is in JUA's capacity as a private insurer regulated by the Insurance Department. The state can obtain JUA's records as regulator, and the public is free to seek from the Insurance Department records JUA is required to file there.

### f. Subjection to the PennWATCH Act

Section 1505-B (3) of Act 15 provides that JUA "shall be considered a Commonwealth agency for purposes of … the Pennsylvania Web Accountability and Transparency (PennWATCH) Act." The PennWATCH Act requires the Governor's Office of Administration to maintain a searchable website that contains annual appropriation and expenditure information for each Commonwealth agency, and the names and salaries of each person employed by each Commonwealth agency. 72 P.S. § 4664.3. In turn, PennWATCH requires each Commonwealth agency to provide the Governor's Office of Administration with the agency's annual appropriation and expenditure information, and its list of employees and salaries. 72 P.S. § 4664. 4. Accordingly, Act 15's requirement that JUA be subject to PennWATCH is essentially dependent upon and derivative of Section 1502-B and 1503-B's appropriation and budget process participation requirements; if the court finds those provisions to be violative of JUA's constitutional rights, the PennWATCH requirement should fall as well.

To the extent the PennWATCH requirement is deemed independent of the appropriation and budget participation provisions of Act 15, it nonetheless imposes an unconstitutional intrusion on JUA's managerial discretion, in violation of the Contracts clause and JUA's substantive due process right to conduct its business free of unreasonable state interference.  Moreover, as a private insurer, JUA's overhead, including salaries, flows through to JUA's rates, and those rates are subject to the Insurance Commissioner's review.

### g.  Subjection to the Commonwealth Procurement Code

Section 1505-B (4) of Act 15 provides that JUA "shall be considered a Commonwealth agency for purposes of" the "Commonwealth Procurement Code." The result is that "every expenditure of funds"[25] by JUA "under any contract" (defined as "a written agreement for the procurement or disposal of supplies services or construction") is subject to the labyrinth of competitive bidding procedures, rules and exceptions established in the Procurement Code as administered by the Department of General Services. *See* 62 Pa. C.S. §§ 101–4509.

This intrusion into JUA's day-to-day operations wrests managerial control from JUA and its Board in violation of JUA's Plan, and thus the Contracts clause, *see supra* argument A.2.b.. It also violates JUA's substantive due process rights,

---

[25] Expenditures for the "investment of funds" are excluded.  62 Pa. C.S. § 102(a).

*see supra* argument A.2.c.  JUA is a private entity, and its funds are private property.

The only arguable basis for requiring JUA to comply with the provisions of the Commonwealth Procurement Code would be that JUA is receiving and expending Commonwealth funds.  In that sense, Section 1505-B (4)'s validity is contingent on the validity of Act 15's requirement in Section 1502-B that "the operations of [JUA] shall be funded through appropriations determined by the General Assembly."  Accordingly, if the court enjoins enforcement of Section 1502-B, there is no basis to subject JUA to the Commonwealth Procurement Code.

### h.  Subjection to Section 614 of the Administrative Code

Section 1506-B (1) of Act 15 provides that JUA "shall … transmit to the Auditor General, the Secretary of the Budget and the Legislative Data Processing Center a list of all employees" of JUA "required under Section 614." As with the PennWATCH requirement, the requirement that JUA adhere to the employee list provisions of Section 614 of the Administrative Code, 71 P.S. § 234, is dependent upon and derivative of Section 1502-B and 1503-B's appropriation and budget process participation provisions; if the court finds those provisions to be violative of JUA's constitutional rights, the Section 614 employee list requirement should fall as well. The purpose of Section 614, and thus Section 1506(B)(1), is to assist the various Commonwealth officials charged by law with creating each year's

budget to understand the size of the Commonwealth's workforce and the cost to maintain it.  JUA, however, is a private entity with private employees. It neither needs, wants, nor seeks a budget appropriation, and neither the number of its employees nor the expense of their salaries places a financial burden on the state. Requiring JUA to supply the information specified violates the Contracts clause and JUA's substantive due process rights.

### i.  Subjection to State-owned office space occupancy

Section 1506-B (2) of Act 15 provides that JUA "shall …conduct [its] operations in facilities owned by the Commonwealth."  Forcing JUA to operate out of a Commonwealth-owned building is an unwanted "gift" that imposes palpable physical state control over the everyday operations of JUA.  Little more needs to be said about the intrusive effect the requirement has on a private entity that has operated for almost half a century as a private business conducting business at locations of its choosing.  It contributes to Act 15's taking because it undermines JUA's financial independence, *see, supra* argument A.2.a.  It violates the Contracts clause because it takes control over a basic operational decision from JUA and its Board, *see, supra* argument A.2.b.  It violates JUA's substantive due process rights, because there is no plausible basis for the state imposing such a disruptive requirement on a private entity, *see, supra* argument A.2.c.

### j. Subjection to federal tax information requirements

Finally, Section 1506-B (3) of Act 15 provides that JUA "shall …coordinate with the Department of Revenue to ensure that any employee of [JUA] with access to federal tax information has met all of the requirements of the Department of Revenue to gain access to that information."  Although this reference is cryptic, it refers to an Administrative Code provision that, as summarized by the Department of Revenue shortly after Act 15 was enacted, requires "all executive branch state agencies or political subdivisions that use federal tax information (FTI) … to require any current or prospective employee or contractor whose duties and responsibilities require access to FTI to submit to fingerprinting and a criminal history background check."[26] The Administrative Code provision, originally enacted as part of Act 40 of 2017, was reenacted, as it happens, in Section 3 of Act 15[27] as Section 226 of the Administrative Code, 71 P.S. § 86.  The Department of Revenue administers the requirement. "Federal tax information" is defined in Section 226 to include "any 'return' or 'return information' as defined in section 6103 of the Internal Revenue Code of 1986." I.R.C. § 6103, in turn, defines "return

---

[26] Pennsylvania Department of Revenue, State Tax Summary: July 2019, *available at* https://www.revenue.pa.gov/GeneralTaxInformation/TaxLawPoliciesBulletinsNotices/TaxSummaries/Documents/2019_tax_summary.pdf, at 4.

[27] The JUA provisions of Act 15 are in Section 7.

information" to include "a taxpayer's identity, the …source, or amount of his

income… tax withheld…." 26 U.S.C. § 6103(b)(2).

Although none of the information JUA collects in the regular course of its

business from its MPL applicants or its MPL insureds is "return" or "return

information" as defined in I.R.C. § 6103, JUA does have four employees. One of

those employees, President and CEO Susan Sersha, reviews the W-2 statements

JUA issues each year. *See* Sersha Dec. at ¶¶ 77-80. Each such statement reveals

the taxpayer's identity, the source and amount of income, and the tax withheld by

JUA as employer. *Id*. Accordingly, by grouping JUA along with "all executive

branch state agencies or political subdivisions that use federal tax information,"

Section 1506-B (3) requires Ms. Sersha to "submit to fingerprinting and a criminal

history background check."

Ms. Sersha is an employee of a private entity, not an "executive branch state

agenc[y] or political subdivision[]." The only "return" or "return information" she

handles is the tax form prepared for JUA's own employees, something every

private employer in Pennsylvania is required to do.  There is no plausible basis for

subjecting JUA to Section 226 of the Administrative Code.  It interferes with

JUA's management discretion in violation of the Contracts clause, *see supra*

argument A.2.b., and violates JUA's substantive due process rights, *see supra*,

argument A.2.c.

## B. The court should grant permanent injunctive relief

Given the constitutional injuries Act 15 inflicts on JUA, a grant of permanent injunctive relief is appropriate because (1) JUA will suffer irreparable injury absent the requested injunction, (2) legal remedies are inadequate to compensate that injury, (3) the balancing of the respective hardships between the parties warrants a remedy in equity, and (4) the public interest is not disserved by an injunction's issuance. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Northeastern Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019).

"The first two elements 'typically constitute two sides of the same inquiry, for the 'availability of adequate monetary damages belies a claim of irreparable injury.' " *Northeastern Pa. Freethought Soc'y*, 938 F.3d at 442, quoting *TD Bank NA v. Hill*, 928 F.3d 259, 282 (3d Cir. 2019) (quoting *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008)). Act 15's forced funding of JUA through an annual appropriation and the related budget process provisions gives the state an ever-growing financial interest in JUA and limits JUA's use of its own funds. Act 15's subjection of JUA to the series of other statutes that apply only to taxpayer-funded entities erases traits that have long established and characterized JUA's private identity, fundamentally changes JUA's nature, removes significant managerial control from JUA's Board and gives it to

the state, deprives JUA of its right to hire its counsel of choice, and treats JUA in a manner that no private entity rationally may be treated. No remedy at law can cure these harms; the only way to address them is to stop them from occurring by permanently enjoining Act 15.[28]

The other factors favor the grant of equitable relief as well. The balance of hardships tips JUA's way. Enjoining Act 15 merely leaves the state in the same enviable position it has occupied vis-à-vis JUA since 1975 – enjoying the benefit of having a private entity subject to state regulation as a private insurer achieve "a public health objective" at "no public cost." *JUA I* at 538. Failing to enjoin Act 15, however, will allow the state to strongarm an economic interest in JUA, give the state control over JUA's use of its own private funds, wrest important decision-making powers from JUA's Board, and fundamentally alter JUA's private entity nature. Finally, the public interest "generally favors the vindication of

---

[28] That the state has not moved swiftly to implement all of the provisions of Act 15 following its enactment and the court's denial of a preliminary injunction in no way diminishes the irreparable harm JUA will suffer absent a permanent injunction. As the court emphasized in denying the "extraordinary remedy" of a preliminary injunction, *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008), the denial was "based on the record as it now stands, crediting the representations by Governor Wolf's counsel that the executive branch will not take the actions that the Association fears," *JUA III* at *5, pending resolution of the merits of JUA's challenge.

constitutional rights." *JUA II* at 342, and is "furthered—not disserved—by permanently enjoining" an unconstitutional statute. *JUA I* at 540.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiff requests this court enter an Order granting summary judgment, declaring that Section 7 of Act 15 is unconstitutional, permanently enjoining its enforcement against JUA on that basis, awarding JUA all fees and costs incurred in this action, including reasonable attorneys' fees, and granting such other relief as the court deems just and equitable under the circumstances.

Respectfully submitted,

*/s/ Kevin J. McKeon*
Kevin J. McKeon, I.D. # 30428
Dennis A. Whitaker, I.D. #53975
Melissa A. Chapaska, I.D. #319449
Hawke McKeon & Sniscak, LLP
100 North Tenth Street
Harrisburg, PA  17101
(717) 236-1300
(717) 236-4841
kjmckeon@hmslegal.com
dawhitaker@hmslegal.com
machapaska@hmslegal.com

*Counsel for Pennsylvania Professional
Liability Joint Underwriting Association*

Dated: April 15, 2020

## CERTIFICATION OF COUNSEL

The undersigned certifies, subject to Fed. R. Civ. P. 11, that the foregoing brief contains 11,744 words and, therefore, complies with the word-count limit set forth by the court's April 1, 2020 order (Doc. 37). This certification is based upon the word count feature of Microsoft Word, the software used to prepare the brief.

/s/ *Kevin J. McKeon*
Kevin J. McKeon

Dated: April 15, 2020

## CERTIFICATE OF SERVICE

I hereby certify that, on April 15, 2020, I electronically filed the foregoing document with the Clerk of the Court for the United States Court District Court for the Middle District of Pennsylvania by using the ECF system. Pursuant to LR 5.7, participants in the case who are registered ECF users will be served by the ECF system.

*/s/ Melissa A. Chapaska*

Melissa A. Chapaska

Hawke, McKeon & Sniscak, LLP
100 N. 10th Street
Harrisburg, PA 17101
machapaska@hmslegal.com