**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENNSYLVANIA PROFESSIONAL LIABILITY JOINT UNDERWRITING ASSOCIATION,** | : | **CIVIL ACTION NO. 1:19-CV-1121** |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| **v.** | : | |
| **TOM WOLF, in his Official Capacity as Governor of the Commonwealth of Pennsylvania, and the GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

For more than four years, the General Assembly of the Commonwealth of Pennsylvania has had the Pennsylvania Professional Liability Joint Underwriting Association ("Joint Underwriting Association" or "Association") in its sights. We have now twice declared unconstitutional the General Assembly's attempts to take the Association's assets as violative of the Fifth Amendment's Takings Clause. Both times, we reasoned that the Association's statutory origin and public purpose do not give the Commonwealth *carte blanche* over the Association's private property.

The General Assembly has now tried a different tack, one it describes as "giving" rather than "taking." (<u>See</u> Doc. 54 at 13). Act 15 of 2019 purports to fund the Association's operating budget with state appropriations and resource it with state attorneys and office space in exchange for the Association's compliance with various oversight and accountability statutes. <u>See</u> Act of June 28, 2019, P.L. 101,

No. 15, § 7 ("Act 15" or "the Act").  The Association resists these measures, seeking a declaration that Act 15 is unconstitutional *in toto* and a permanent injunction against its enforcement.  We conclude that certain aspects of Act 15—specifically, its attempt to force the Association to operate using Commonwealth funding and to litigate using Commonwealth lawyers—once more transgress the United States Constitution.  The balance of the Act, however, is an appropriate exercise of state authority over a private entity charged with carrying out a critical public-health mission.  We will accordingly grant in part and deny in part the parties' cross-motions for summary judgment.

I.      **Factual Background and Procedural History**

The factual backdrop of this litigation is outlined at length in our opinions in Pennsylvania Professional Liability Joint Underwriting Association v. Wolf, No. 1:17-CV-2041 (M.D. Pa.) ("JUA I"), and Pennsylvania Professional Liability Joint Underwriting Association v. Wolf, No. 1:18-CV-1308 (M.D. Pa.) ("JUA II"), as well as the preliminary injunction opinion issued in this case, (see Doc. 16).  The parties have stipulated that the factual records developed in JUA I and JUA II constitute part of the record in this case for purposes of their cross-motions for summary judgment.  We reiterate salient facts for context below.

A.      **The Joint Underwriting Association**

The Joint Underwriting Association is a nonprofit association organized under the laws of the Commonwealth of Pennsylvania.  See JUA I, 324 F. Supp. 3d 519, 523 (M.D. Pa. 2018); JUA II, 381 F. Supp. 3d 324, 326 (M.D. Pa. 2018).  The Association was initially established by the Pennsylvania Health Care Services

Malpractice Act, P.L. 390, No. 111 (1975), and later reestablished by the Medical Care Availability and Reduction of Error (MCARE) Act, 40 PA. STAT. AND CONS. STAT. ANN. § 1303.101 *et seq.*

The General Assembly conceived of the Association in 1975 in response to declining availability of medical malpractice insurance in the Commonwealth.  See JUA I, 324 F. Supp. 3d at 523; JUA II, 381 F. Supp. 3d at 326.  Through the MCARE Act, the General Assembly tasked the Association to offer medical professional liability ("MPL") insurance to healthcare providers and entities that "cannot conveniently obtain" it through ordinary methods at ordinary market rates.  See 40 PA. STAT. AND CONS. STAT. ANN § 1303.732(a).  Membership in the Association is mandatory for insurers authorized to write MPL insurance in the Commonwealth. Id. § 1303.731(a).

The MCARE Act assigns four "duties" to the Association, requiring it to (1) submit a plan of operations to the Commonwealth's Insurance Commissioner, (2) submit rates and any modifications for approval by the Insurance Department, (3) offer insurance as described above, and (4) file its schedule of occurrence rates with the Commissioner.  Id. § 1303.731(b)(1)-(4).  The Association, like other insurers licensed to operate within the Commonwealth, is "supervised" by the Insurance Department.  Id. § 1303.731(a); see JUA I, 324 F. Supp. 3d at 525; JUA II, 381 F. Supp. 3d at 328.  The MCARE Act otherwise provides that all "powers and duties" of the Association "shall be vested in and exercised by a board of directors."  40 PA. STAT. AND CONS. STAT. ANN § 1303.731(a).

The Association's plan of operations, developed with and approved by the Insurance Department, establishes a 14-member board of directors comprised of the Association's current president, nine directors chosen by the Association's members, and four directors appointed by the Insurance Commissioner.  See JUA I, 324 F. Supp. 3d at 525; JUA II, 381 F. Supp. 3d at 328.  The plan provides that the Association may be dissolved (1) "by operation of law" or (2) at the request of its members, subject to Commissioner approval.  JUA I, 324 F. Supp. 3d at 525; JUA II, 381 F. Supp. 3d at 328.  The plan also provides that, "[u]pon dissolution, all assets of the Association, from whatever source, shall be distributed in such manner as the Board may determine subject to the approval of the Commissioner."  JUA I, 324 F. Supp. 3d at 525; JUA II, 381 F. Supp. 3d at 328.

Susan Sersha is the Association's President and Chief Executive Officer.  (See Doc. 40-1 ¶ 25; Doc. 56 ¶ 25).  Sersha testified that the Association currently maintains a staff of between four and five employees.  (See Doc. 40-1 ¶ 25; see also Doc. 40-1, Ex. A, Sersha Dep. 103:10-105:18).  The Association hires and pays its own employees, who do not participate in the State Employees' Retirement System or receive any other Commonwealth employee benefits.  See JUA I, 2017 WL 5625722, at *3 (M.D. Pa. Nov. 22, 2017).  The Association operates from a privately leased office in Blue Bell, Pennsylvania.  (See Doc. 40-1 ¶¶ 26, 54; Doc. 56 ¶¶ 26, 54).  Its lease will expire in October 2021.  (See Doc. 40-1 ¶ 26; Doc. 56 ¶ 26).

The Association is obligated under the insurance policies it issues to supply legal counsel for its policyholders.  (See Doc. 43 ¶ 51; Doc. 53 ¶ 51; Doc. 58 ¶ 51).  It also has an "ongoing need" for advice and representation from corporate counsel,

4

as well as a need "from time to time," as in this case, for litigation counsel.  (See Doc. 43 ¶¶ 52-53; Doc. 53 ¶¶ 52-53; Doc. 58 ¶¶ 52-53).  The Association independently vets, selects, and retains private counsel for these purposes.  (See Doc. 43 ¶¶ 51-53; Doc. 53 ¶¶ 51-53; Doc. 58 ¶¶ 51-53).

Since its inception, the Association has functioned much like a private insurance company.  The Association writes insurance policies directly to its insureds, who pay premiums directly to the Association.  JUA I, 324 F. Supp. 3d at 525; JUA II, 381 F. Supp. 3d at 328.  The Association is funded exclusively by policyholder premiums and investment income, which it holds in private accounts in its own name.  JUA I, 324 F. Supp. 3d at 525; JUA II, 381 F. Supp. 3d at 328.  The Commonwealth has never funded the Association, nor has it ever been responsible for the Association's debts.  JUA I, 324 F. Supp. 3d at 525; JUA II, 381 F. Supp. 3d at 328.  Indeed, prior to recent legislative enactments, the MCARE Act expressly disclaimed Commonwealth responsibility for claims against and liabilities of the Association.  See JUA I, 324 F. Supp. 3d at 537-38; JUA II, 381 F. Supp. 3d at 328.

The Association maintains two pools of assets: its "reserves," which represent funds designated for payment of anticipated claims during the calendar year, and its "surplus," which represents all funds not earmarked as reserves.  See JUA I, 324 F. Supp. 3d at 525-26; JUA II, 381 F. Supp. 3d at 328-29.  The surplus serves as a safety net or "backstop" of sorts to ensure that the Association can continue to meet its obligations in the event its actuaries underestimate claim maturation or other market factors.  See JUA I, 2017 WL 5625722, at *3; JUA I, 324 F. Supp. 3d at 526; JUA II, 381 F. Supp. 3d at 329.  Sersha testified during a

March 2020 deposition that the Association's surplus is approximately $298,276,876. (<u>See</u> Doc. 47 ¶ 6; Doc. 55 ¶ 6; <u>see also</u> Doc. 40-1 ¶ 28; Doc. 56 ¶ 28).

**B.    Prior Legislative Acts and Lawsuits**

The legal tug-of-war underlying this lawsuit began in 2016, with the General Assembly's first attempt to access the Joint Underwriting Association's assets.  Act 85 of 2016 directed the Association to make a $200,000,000 loan to the Commonwealth from the Association's surplus.  <u>See</u> Act of July 13, 2016, No. 85, § 18 ("Act 85").  Next came Act 44 of 2017, in which the General Assembly repealed Act 85, declared the Association to be "an instrumentality of the Commonwealth," and ordered the Association, under threat of abolishment, to pay $200,000,000 to the State Treasurer for deposit into the General Fund.  <u>See</u> Act of October 30, 2017, No. 44, §§ 1.3, 13 ("Act 44").  Act 41 of 2018, enacted the following year, took the most drastic steps to date, attempting to fold the Association into the Department, shift control of the Association to a board of political appointees, oust the Association's president, and mandate transfer of all of the Association's assets to the Department within 30 days.  <u>See</u> Act of June 22, 2018, No. 41, § 3 ("Act 41").

The Association answered each enactment with a lawsuit raising constitutional challenges to the legislation and seeking declaratory and injunctive relief.  The first of those lawsuits, concerning Act 85, has been held in abeyance at the parties' request pending the outcome of litigation as to Act 44 and Act 41. <u>See</u> <u>Pa. Prof'l Liab. Joint Underwriting Ass'n v. Albright</u>, No. 1:17-CV-886, Doc. 34 (M.D. Pa. June 14, 2018).  In the second lawsuit, <u>JUA I</u>, we preliminarily and later permanently enjoined enforcement of Act 44 against the Association, holding that

notwithstanding its statutory origin, the Association is a private entity, its funds are private property, and the Takings Clause of the Fifth Amendment prohibits Act 44's attempt to take those funds without just compensation.  See JUA I, 324 F. Supp. 3d at 532-40.  In the third lawsuit, JUA II, we preliminarily and later permanently enjoined Act 41, concluding that the legislation was an attempt to do indirectly what JUA I told the General Assembly it could not do directly—take the Association's funds.  See JUA II, 381 F. Supp. 3d at 341-42.  The General Assembly and Governor Wolf appealed in both cases, and the court of appeals has held the matters in abeyance pending resolution of the instant case.

### C.    Act 15

On June 28, 2019, Governor Wolf signed Act 15 into law.[1]  Unlike its predecessors, Act 15 does not take the Association's funds directly, alter its governance structure or board composition, replace its employees, or otherwise wrest full control of its operations.  Rather, Act 15 purports to provide state funding and other resources to the Association and to subject it to various government oversight and transparency statutes.  The pertinent provisions of Act 15 are as follows:

- Section 1502-B provides that the Association's "operations . . . shall be funded through appropriations determined by the General Assembly," Act 15, § 1502-B;

---

[1] Act 15 includes multiple sections, with Section 7 addressing the Joint Underwriting Association.  Section 7 itself includes multiple subsections.  For ease of reference, we cite directly to those subsections, using the following convention: Act 15, §§ 1501-B, 1502-B, 1503-B, 1504-B, 1505-B, 1506-B.

- Section 1503-B(a) requires the Association to "submit written estimates to the Secretary of the Budget as required of administrative departments, boards and commissions under section 615 [of the Administrative Code," at least once per year and "from time to time as requested by the Governor," id. § 1503-B(a);

- Section 1503-B(b) requires an agent of the Association to appear at a public hearing of the Pennsylvania Senate's Banking and Insurance Committee and the Pennsylvania House of Representatives' Insurance Committee to testify concerning the estimate within 30 days after its submission, and requires the Association to appear annually before the Appropriations Committees of both chambers of the General Assembly to testify as to its fiscal status and to request appropriations, id. § 1503-B(b);

- Section 1504-B requires the Association to hold quarterly public meetings under the state's open meetings law, known as the Sunshine Act, to discuss its actuarial and fiscal status, id. § 1504-B;

- Section 1505-B declares the Association "a Commonwealth agency" for purposes of the Commonwealth Attorneys Act, the Right-to-Know Law, the PennWATCH Act, and the Commonwealth Procurement Code, id. § 1505-B; and

- Section 1506-B requires the Association to (1) transmit a list of all employees to the Auditor General, State Treasurer, Secretary of the Budget, and Legislative Data Processing Center; (2) conduct its operations in Commonwealth-owned facilities; and (3) coordinate with the Department of Revenue to ensure that Association employees with access to federal tax information meet that department's requirements for access to such information, id. § 1506-B.

Act 15 took effect immediately upon signing on June 28, 2019.  In the interim, the Association has not been asked to terminate its lease or move its operations to Commonwealth office space, (see Doc. 40-1 ¶ 54; Doc. 56 ¶ 54), and it continues to be represented here and in the pending appeals by its preferred private counsel, (see Doc. 43 ¶ 54; Doc. 53 ¶ 54; Doc. 58 ¶ 54).  The Association has complied with the Sunshine Act and Right-to-Know Law.  (See Doc. 43 ¶¶ 43,

64; Doc. 53 ¶¶ 43, 64; Doc. 58 ¶¶ 43, 64).  At the request of the Senate and House

Appropriations Committees, Sersha appeared and provided testimony in March

2020 but did not request an appropriation.  (See Doc. 43 ¶ 40; Doc. Doc. 53 ¶ 40;

Doc. 58 ¶ 40).

### D.   Procedural History

The Joint Underwriting Association initiated this lawsuit with the filing

of a verified complaint on July 1, 2019, just three days after Act 15 was signed into

law.  The Association asserts that Act 15 violates its rights under the Substantive

Due Process Clause (Count I), the Takings Clause (Count II), the Contract Clause

(Count III), and the Procedural Due Process Clause and First Amendment (Count

IV).  It also pleads a request (Count V) for declaratory and permanent injunctive

relief.  The verified complaint names Governor Wolf and the General Assembly as

defendants.

The Association immediately moved for a temporary restraining order and

preliminary injunction.  We denied the request for a temporary restraining order

but expedited proceedings on the request for a preliminary injunction, hearing

argument on the Association's motion on July 12, 2019.  In an opinion issued July

17, 2019, we denied the Association's motion, holding that, unlike Acts 41 and 44,

Act 15 posed no threat of imminent and irreparable harm.  We promptly convened a

case management conference and set a schedule for fact discovery and dispositive

motions.  The parties have now filed and fully briefed their cross-motions for

summary judgment, which are ripe for disposition.

## II.   <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." <u>Thomas v. Cumberland County</u>, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. <u>See</u> <u>Pappas</u>, 331 F. Supp. 2d at 315.

Courts may resolve cross-motions for summary judgment concurrently. <u>See</u> <u>Lawrence v. City of Philadelphia</u>, 527 F.3d 299, 310 (3d Cir. 2008); <u>see also</u> <u>Johnson v. FedEx</u>, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015). When doing so, the court is bound to view the evidence in the light most favorable to the nonmoving party with respect to each motion. FED. R. CIV. P. 56; <u>Lawrence</u>, 527 F.3d at 310 (quoting <u>Rains v. Cascade Indus., Inc.</u>, 402 F.2d 241, 245 (3d Cir. 1968)).

### III.  **Discussion**

The history of the JUA trilogy is known well to the parties and the court, and we need not retell it at length here.  It is sufficient for purposes of the instant motions to reiterate the pertinent holdings of the predecessor cases.  In JUA I, we held that the Joint Underwriting Association is a private entity, its assets are private property, and the Fifth Amendment prohibits the Commonwealth from taking that property for public use without just compensation.  See JUA I, 324 F. Supp. 3d at 538.  Then in JUA II, we held that the same constitutional concerns barred the General Assembly from taking the Association's assets indirectly, by recapturing it as an "instrumentality of the Commonwealth."  See JUA II, 381 F. Supp. 3d at 341, 342-43.  As we observed at the preliminary injunction stage in this case, Act 15 tests the outer bounds of those holdings, tasking us to consider what degree of authority, if any, the Commonwealth may assert over the Association.

Before we turn to the discrete and nuanced issues in this case, we address the Association's threshold argument that the challenged sections of Act 15 must be scrutinized—and, thus, rise or fall—as a whole.  (See Doc. 45 at 16-19).  Not only is this assertion inconsistent with settled principles of statutory construction and the presumption of severability, see 1 PA. CONS. STAT. § 1925 ("The provisions of every statute shall be severable."); Barr v. Am. Ass'n of Pol. Consultants, 591 U.S. ___, 140 S. Ct. 2335, 2350 (2020) ("The Court presumes that an unconstitutional provision in a law is severable from the remainder of the law or statute."), it is inconsistent with the Association's approach to this lawsuit.

11

The complaint catalogues the Association's claims into individual allegations of constitutional harm flowing from specific sections of Act 15. The Takings Clause claim, for example, targets only the appropriations and budget-estimate sections which, due to their functional interrelationship, are properly analyzed together. (See Doc. 1 ¶¶ 39-47). The Contract Clause claim challenges these same provisions,[2] (see id. ¶¶ 48-60), and the claim under the Procedural Due Process Clause and First Amendment contests solely the Act's requirement that the Association use Commonwealth counsel, (see id. ¶¶ 61-67). Only the claim under the Substantive Due Process Clause encompasses all components of Act 15. (See id. ¶¶ 30-38). Given the severability presumption and the nature of the Association's constitutional theories, we will assess the provisions of Act 15 individually, through the prism of the Association's four claims.

---

[2] We note that the Association's Contract Clause claim has winnowed. The Association's complaint posited that "Section 7 of Act 15 impairs contracts in two ways": first, by impairing its plan of operations, (Doc. 1 ¶¶ 51, 52-56), and second, by impairing its lease agreement, (id. ¶¶ 51, 57-59). The Association appears to have abandoned the claim pertaining to its lease: both defendants move for summary judgment on that claim, (see Doc. 41 at 35, 37-38; Doc. 48 at 30), and the Association fails to defend the claim in its brief opposing those motions, (see Doc. 57 at 18-22). The Association's briefs on its own summary judgment motion are likewise silent concerning Act 15's perceived impact on its lease. (See Doc. 45 at 27-32; Doc. 64 at 17-20). Under the circumstances, we construe the Association's nonresponse as an abandonment of this claim. See Malibu Media, LLC v. Doe, 381 F. Supp. 3d 343, 361 (M.D. Pa. 2018) (Conner, C.J.) (citing Stauffer v. Navient Sols., LLC, 241 F. Supp. 3d 517, 519 n.3 (M.D. Pa. 2017) (Conner, C.J.) (collecting cases))); Reeves v. Travelers Cos., 296 F. Supp. 3d 687, 692 (E.D. Pa. 2017) (quoting Campbell v. Jefferson Univ. Physicians, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014)). Hence, we limit the Contract Clause claim to purported interference with the Association's plan of operations.

A.    **Takings Clause**

Our analysis starts in now-familiar territory, with the Fifth Amendment's

Takings Clause.  See U.S. CONST. amend. V.  We have previously articulated the

fundamental principles of takings law, see JUA I, 324 F. Supp. 3d at 528-29; JUA II,

381 F. Supp. 3d at 332, and those principles apply equally here.

The Takings Clause of the Fifth Amendment prohibits the government

from taking private property for public use without just compensation.  U.S. CONST.

amend. V.  The Takings Clause is made applicable to the states by the Fourteenth

Amendment.  See U.S. CONST. amend. XIV; Murr v. Wisconsin, 582 U.S. __, 137 S.

Ct. 1933, 1942 (2017) (citing Chi., B. & Q. R. Co. v. Chicago, 166 U.S. 226 (1897)).  It

applies to protect not only the property itself, but also the "valuable rights" that

inhere in property, including the rights to "possession, control, and disposition"

thereof.  See Phillips v. Wash. Legal Found., 524 U.S. 156, 160, 164-65 (1998); see

also Webb's Fabulous Pharms., Inc. v. Beckwith, 449 U.S. 155, 164-65 (1980).

Takings claims generally fall into two categories—physical and regulatory.

See Yee v. City of Escondido, 503 U.S. 519, 522-23 (1992).  The Association's claims

in JUA I and JUA II alleged a physical taking, and we found a physical taking in

each case; both Act 44 and Act 41 attempted to take the Association's private funds

and move them directly into sovereign coffers.  See JUA I, 324 F. Supp. 3d at 528-29;

JUA II, 381 F. Supp. 3d at 341.  No comparable physical taking is alleged here, nor

could it be: Act 15 does not "take" anything for the Commonwealth in the literal

sense.  Instead, the Association posits a regulatory taking, asserting that Act 15's

appropriations and budget-estimate provisions restrict its ability to possess, control, and dispose of its private funds as it sees fit.  (See Doc. 45 at 19-27).

The Supreme Court of the United States first embraced the concept of a regulatory taking nearly a century ago, in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922).  As Justice Holmes explained, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  Mahon, 260 U.S. at 415.  To be sure, there are few bright-line rules in regulatory takings jurisprudence; per contra, "[t]his area of law has been characterized by 'ad hoc, factual inquiries, designed to allow careful examination and weighing of all relevant circumstances.'"  See Murr, 137 S. Ct. at 1942 (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002)).  Nevertheless, the Supreme Court has offered "guidelines" for assessing whether a challenged regulation "is so onerous that it constitutes a taking."  Id. (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001)).  First, a regulation generally effects a taking if it denies the owner "all economically beneficial or productive use" of the property.  Id. at 1942-43.  Second, even if a regulation leaves some beneficial use for the owner, a court may still find a taking "based on 'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  Id. at 1944.

The Association's takings claim challenges two provisions of Act 15: Section 1502-B, which funds the Association's operating budget with state appropriations, and Section 1503-B, which establishes procedures by which the Association will tell

the General Assembly about its operations and fiscal needs.[3]  See Act 15, §§ 1502-B,

1503-B.  The Association argues that these dual provisions diminish its autonomy

and thus its "status" as a private entity, claim a financial interest in the Association

for the state, and divest it of control over its private funds.  (See Doc. 45 at 22-27).

Defendants, for their part, depict Act 15 as a gift horse: a munificent infusion of

Commonwealth funding with no strings attached.  (See Doc. 45 at 13-14).  A plain

reading of Act 15, however, reveals this gift horse to be of the Trojan variety.  As we

will explain, by ordaining state appropriations as the Association's exclusive source

of operative funding, Act 15 can only be read to prohibit the Association from

spending its own private funds.[4]

---

[3] Unsurprisingly, the General Assembly has offered no authority establishing that it can do what it has attempted to do in Sections 1502-B and 1503-B, namely, force a private entity to accept Commonwealth funding that the entity does not want or need.  It has made no meaningful effort to persuade us that it can.  Counsel simply reiterates the General Assembly's view, rejected in JUA I and JUA II, that, because it created the Association, it can do with the Association as it pleases.  (See, e.g., Doc. 54 at 20).  Counsel provided examples during our preliminary injunction hearing of appropriations to private or quasi-private higher education institutions, but to date has offered no support for the proposition that the state can force any private entity to accept public funding.  We need not tarry on this point, though, because even if forced funding of private entities is somehow lawful, we conclude infra that these sections interfere with the Association's control of its private funds so substantially as to independently effect a taking.

[4] Because we agree with the Association that Sections 1502-B and 1503-B impermissibly interfere with its ability to control and dispose of its private property, we need not resolve its separate claims that those sections "provide[] the state with an ownership interest in JUA" and "diminish[] JUA's autonomy."  (See Doc. 45 at 22, 27).

Our interpretation of Sections 1502-B and 1503-B begins, as it must, with the statutory language. See *In re* Phila. Newspapers, LLC, 599 F.3d 298, 304 (3d Cir. 2010); see also 1 PA. CONS. STAT. § 1921(b).  We must presume that the legislature "says in a statute what it means and means in a statute what it says there."  *In re* Phila. Newspapers, LLC, 599 F.3d at 304 (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).  If the language employed is unambiguous, our inquiry goes no further.  See id.  In determining whether language is unambiguous, we "read the statute in its ordinary and natural sense."  Da Silva v. Att'y Gen. U.S., 948 F.3d 629, 635 (3d Cir. 2020) (quoting *In re* Phila. Newspapers, 599 F.3d at 304).

Section 1502-B states, in full: "Notwithstanding any provision of law to the contrary, the operations of the [Joint Underwriting Association] shall be funded through appropriations determined by the General Assembly."  Act 15, § 1502-B. Section 1503-B(a) then establishes a budget-estimate requirement, providing that the Association "shall submit written estimates to the Secretary of the Budget as required of administrative departments, boards and commissions under section 615 [of the Administrative Code]."  Id. § 1503-B(a).  Section 615 of the Administrative Code, in turn, explains what an estimate must entail, namely, that it must identify "the amount of money required and the levels of activity and accomplishment for each program carried on by each department, board or commission," and must include "[a]ll available Federal funds and funds from other sources."  71 PA. STAT. AND CONS. STAT. ANN. § 235(a).  Section 615 also includes procedures for "approval or disapproval" of the estimate by the Secretary of the Budget, see id., as well as a broad prohibition barring covered entities from "expend[ing] any appropriation,

16

Federal funds or funds from other sources . . . except in accordance with such estimate," see id. § 235(b).

The parties initially dispute whether Act 15 incorporates all or just part of Section 615. The Association reads the reference to Section 615 as sweeping in not only the estimate-submission requirement, but also the requirement of state budget approval and the restrictions on using funds in any manner inconsistent with the approved budget. (See Doc. 45 at 25-26). The General Assembly posits that Act 15 does not explicitly bar the Association from using its private funds toward its operations, (see Doc. 63 at 3), and that the only way to arrive at such a restrictive reading is to incorporate the full text of Section 615 into the Act against the General Assembly's will, (see Doc. 54 at 16-19; see also Doc. 63 at 3-4).

We read Section 1503-B as the General Assembly does, to require nothing more of the Association than submission of a budget estimate. Section 615 of the Administrative Code addresses multiple aspects of the Commonwealth's budget procedures, ranging from budget-estimate submission, to revision, to approval, to implementation, to enforcement. See 71 PA. STAT. AND CONS. STAT. ANN. §§ 235(a)-(d). Yet the General Assembly included just one aspect, budget-estimate submission, in Section 1503-B. We must assume that by doing so, it deliberately excluded all others. See NLRB v. SW Gen., Inc., 580 U.S. ___, 137 S. Ct. 929, 940 (2017) (explaining familiar canon expressio unius est exclusio alterius); Atcovitz v. Gulph Mills Tennis Club, Inc., 812 A.2d 1218, 1223 (Pa. 2002) (same). Moreover, later sections of Act 15 assure us that, when the General Assembly intended to subject the Association to an entire statutory framework, it did so explicitly. See

Act 15, § 1505-B (subjecting the Association to the Commonwealth Attorneys

Act, Right-to-Know Law, PennWATCH Act, and Commonwealth Procurement

Code).  The legislature could have designated the Association an "administrative

department[], board[] [or] commission[]" for purposes of Section 615, see 71 PA.

STAT. AND CONS. STAT. ANN. § 235(a), but it did not.  We read Section 1503-B to

mean what just it says: that the Association shall submit an estimate at least once

annually to the Secretary of the Budget.

The trouble for defendants is that the Joint Underwriting Association does

not need Section 615 to establish its claim—Act 15 effects an unconstitutional taking

on its own.  Section 1503-B(a) requires the Association to submit an estimate

outlining its expected expenditures, presumably so the legislature can assess its

fiscal needs, and Section 1503-B(b) requires a representative of the Association to

appear before various legislative committees to testify about its estimate and its

fiscal status.  See Act 15, § 1503-B(a)-(b).  Section 1502-B then taps the legislative

power of the purse and identifies "appropriations determined by the General

Assembly" as the sole source of funding for the Association's operations.  See Act

15, § 1502-B.  This edict has a severe consequence for Fifth Amendment purposes:

in forcing the Association to operate using only state funds, Act 15 strips the

Association of the right to control its private funds—premium dollars paid by

insureds—as it sees fit.

The General Assembly claims that there is no such prohibition "in the

Act's text," arguing that nothing in Act 15 expressly prohibits the Association

"from spending its purportedly 'private' funds."  (Doc. 63 at 3).  In advocating an

expansive reading of Section 1502-B, the General Assembly jettisons the same principles of construction that supported a narrow reading of Section 1503-B. The General Assembly cannot have its cake and eat it too. The language of Section 1502-B is plain: it contemplates just one source of funding ("appropriations determined by the General Assembly") for the Association. See Act 15, § 1502-B; see also 1 PA. CONS. STAT. § 1921(b). We must assume that by identifying state appropriations alone as the Association's source of operational funding, the General Assembly deliberately excluded, by negative implication, use of any other funds for that purpose. See SW Gen., 137 S. Ct. at 940; Atcovitz, 812 A.2d at 1223. Indeed, to adopt the General Assembly's permissive interpretation of Section 1502-B would require us to read in an entire disjunctive clause—"shall be funded by appropriations determined by the General Assembly *or by any other funds available to the Association*"—that is nowhere to be found in the Act itself. Had the General Assembly intended Act 15 to authorize the Association to operate using both private *and* public funds, surely, it would have said so. See *supra* at 17-18.

We find that there is only one reasonable interpretation of Section 1502-B: going forward, the Joint Underwriting Association must use state appropriations, and *only* state appropriations, to fund its operations. The necessary implication is that the Association is prohibited from using its private funds for that purpose. And because the Association is organized as a nonprofit with a limited operational mission, see 15 PA. CONS. STAT. § 9114(d); see also 40 PA. STAT. AND CONS. STAT. ANN

§ 1303.732(a), the ultimate effect of Act 15 is to deny the Association the ability to use its private funds at all.[5]

This direct sovereign interference with the Association's use of its existing and anticipated private funds effects a regulatory taking.  The Supreme Court has long acknowledged that "possession, control, and disposition are . . . valuable rights that inhere in . . . property."  Phillips, 524 U.S. at 170 (citing Hodel v. Irving, 481 U.S. 704, 715 (1987)).  Moreover, it is a "fundamental maxim of property law that the owner of a property interest may dispose of all or part of that interest as he sees fit."  Id. at 167-68 (citing United States v. Gen. Motors Corp., 323 U.S. 373, 377-78 (1945)).  By prohibiting the Association from spending its private funds as it might choose, Act 15 deprives the Association of these essential property rights.

As we intimated at the preliminary-injunction stage, Act 15's prohibition on the Association's use of its own funds "run[s] headlong" into our holdings in JUA I and JUA II that the Association is a private entity and that its funds are private property in which the Commonwealth does not have, and cannot take, an interest.  (See Doc. 16 at 10).  Sections 1502-B and 1503-B not only give the Commonwealth control of the Association's operational expenditures going forward, they also prohibit the Association from using its private funds for that purpose.  The result is

---

[5] Other than remonstrating broadly that Act 15 does not "prevent[] the JUA from spending its purportedly 'private' funds," (Doc. 63 at 3), the General Assembly offers no explanation of exactly *how* it thinks the Association *could* spend its private funds under Act 15.  The closest it comes is acknowledging, in a related argument, that Commonwealth funding could result in "extra padding" for the Association, since the premiums and investment income that currently fund its operations would be relegated to its surplus.  (See Doc. 54 at 13 n.5).

to deprive the Association of its right to possess, control, and dispose of its private property as it sees fit.  See Phillips, 524 U.S. at 167-68, 170 (citing Hodel, 481 U.S. at 715; Gen. Motors Corp., 323 U.S. at 377-78).

Finally, we address the General Assembly's assertion that, even if Act 15 "does grant the Commonwealth some control over JUA spending, it would still be constitutional."  (Doc. 54 at 20).  The legislature's argument here is grounded entirely in a perception of the Association and its funds that we have now twice rejected: that because the Association "was created by the General Assembly to perform a statutory mission," and its "'operations' advance that mission," then the General Assembly "is within its right to both 'fund' those activities and dictate how those funds are used."  (Id.)  As we explained in JUA I and JUA II, the General Assembly "made a choice when it created the Association in 1975, and . . . its choice has present-day constitutional consequences."  See JUA II, 381 F. Supp. 3d at 333 (citing JUA I, 324 F. Supp. 3d at 538).  When it chose to meet its public-health objectives through a private, nonprofit association "in which the state is not alone or, indeed, at all interested, and over which the state retains virtually no control," the General Assembly relinquished any sovereign claim to the Association or its assets.  Id. at 341.  The consequence of that choice is that the General Assembly may not interfere with the Association's control of its private funds, and Act 15's attempt to do so in Sections 1502-B and 1503-B is an unconstitutional regulatory taking.

Accordingly, we will grant the Association's motion for summary judgment and declaratory judgment with respect to Count II.[6]

### B.  First Amendment and Procedural Due Process

The balance of the Association's claims take us to new territory, informed but not answered by our Fifth Amendment analysis in JUA I and JUA II.  We first address the Association's contention that Section 1505-B(1) of Act 15 violates the First Amendment and Procedural Due Process Clause by subjecting it to the Commonwealth Attorneys Act, in violation of its constitutional right "to hire counsel of its choice to represent it in civil litigation."  (See Doc. 45 at 44).

The Commonwealth Attorneys Act ("Attorneys Act") establishes the Office of Attorney General and Office of General Counsel and, *inter alia*, outlines the roles and responsibilities of each.  See 71 PA. STAT. AND CONS. STAT. ANN. § 732-101 *et seq.* Pertinent here, the Attorneys Act states that "[t]he Attorney General shall represent

---

[6] The Association's remaining Contract Clause claim challenges only these two provisions of the Act 15.  (Doc. 1 ¶ 55 (citing Act 15, §§ 1502-B, 1503-B)). Although the Association suggests throughout its briefing that other subsections of Act 15 may likewise violate the Contract Clause, (see, e.g., Doc. 45 at 30), these new claims are not fairly encompassed in the complaint and thus are not properly before the court.  See Diodato v. Wells Fargo Ins. Servs., USA, Inc., 44 F. Supp. 3d 541, 559 (M.D. Pa. 2014) (Conner, C.J.) ("It is well-settled that [a plaintiff] may not amend his complaint in his brief in opposition to a motion for summary judgment." (quoting Bell v. City of Philadelphia, 275 F. App'x 157, 160 (3d Cir. 2008) (nonprecedential) and collecting cases)); Ward v. Noonan, 147 F. Supp. 3d 262, 280 & n.17 (M.D. Pa. Nov. 25, 2015) (Caputo, J.) (explaining that a plaintiff cannot "expand his claims to assert new theories for first time in response to a summary judgment motion" (citations omitted)); see also Pennsylvania *ex rel.* Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted) (alteration in original)).  Because we will enter summary judgment and declaratory judgment in the Association's favor as to Section 1502-B and Section 1503-B, the balance of the Association's Contract Clause claim is moot.

the Commonwealth and all Commonwealth agencies . . . in any action brought by or against the Commonwealth or its agencies." <u>Id.</u> § 732-204(c).  The Attorneys Act authorizes the Attorney General, "upon determining that it is more efficient or otherwise is in the best interest of the Commonwealth, [to] authorize the General Counsel . . . to initiate, conduct or defend any particular litigation or category of litigation in [the Attorney General's] stead." <u>Id.</u>

The Association contends that this violates its perceived right to counsel of choice in two ways: first, by interfering in its legal defense of its insureds, which it describes as its "primary need for legal services," (<u>see</u> Doc. 45 at 46), and second, by interfering with its "ongoing need" for advice and representation by corporate and regulatory counsel, and its "periodic need" for litigation counsel, as in this lawsuit and its predecessors, (<u>see</u> <u>id.</u>).  We can dispense with the first theory in short order. The plain text of the Attorneys Act mandates state representation *only* for suits that are "brought by or against the Commonwealth or its agencies," <u>see</u> 71 PA. STAT. AND CONS. STAT. ANN. § 732-204(c), so it would not apply when the Association is not party to the suit—as when it supplies counsel for its insureds.  This aspect of the Association's claim simply has no bearing on the *Association's* right to counsel.  The Association's second claim—that Act 15 violates its own right to counsel of choice— is a bit more complex.

Preliminarily, we must address defendants' claim that no such right exists.  The General Assembly and Governor Wolf defend their decision to foist Commonwealth representation upon the Association by invoking our court of appeals' decision in <u>Kentucky West Virginia Gas Co. v. Pennsylvania P.U.C.</u>, 837

F.2d 600 (3d Cir.), <u>cert. denied</u>, 488 U.S. 941 (1988).  Defendants cling tightly to the court's statement that "[t]he Supreme Court has not recognized a constitutional right to counsel in a civil case," <u>see</u> <u>id.</u> at 618, claiming that, because there is no "right to counsel" in civil lawsuits, it follows that "there is likewise no subsidiary right to counsel-of-choice," (<u>see</u> Doc. 63 at 23; <u>see also</u> Doc. 65 at 8-9).  Thus, according to defendants, <u>Kentucky West Virginia Gas</u> extinguishes any claim that the state can violate the Constitution by interfering with one's selection of civil counsel.  Taken to its logical end, defendants' position would allow a state to force its attorneys upon *anyone*, since, they say, civil litigants have no constitutional interest in who represents them.

<u>Kentucky West Virginia Gas</u> is a much narrower decision than defendants believe it to be.  In that case, a state agency directed a utility to retain counsel "separate and independent" from its affiliate based on the potential for a conflict if the parties continued with joint representation.  <u>See</u> <u>Ky. W. Va. Gas</u>, 837 F.2d at 617.  The court of appeals identified the question before it as whether the utility had a due-process right to joint representation that was violated by the separate-counsel order.  <u>See</u> <u>id.</u> at 618.  At the outset of its analysis, the court noted that "[t]he Supreme Court has not recognized a constitutional right to counsel in a civil case or in civil matters before an administrative agency."  <u>Id.</u>  The court then observed that the utility had a statutory right to counsel and that, "where the right to counsel exists," the Fifth Amendment's due process clause "provide[s] some protection for the decision to select a particular attorney."  <u>Id.</u>  This due-process right, the court explained, is limited, going "no further than preventing arbitrary dismissal of a

chosen attorney, and providing a fair opportunity to secure counsel of one's choice." See id. The court concluded that the order to retain separate counsel "violate[d] neither due process nor the [Administrative Procedures Act]" given the potential conflict of interest. Id.

Defendants select an isolated phrase from Kentucky West Virginia Gas (that "[t]he Supreme Court has not recognized a constitutional right to counsel in a civil case"), sever it from crucial context, and wield it as the end-all of counsel-related rights. (See Doc. 63 at 23; Doc. 65 at 8).  If the court of appeals had intended such a sweeping foreclosure, it would have left no room for doubt.  We read the quoted statement as nothing more than an affirmation that the Supreme Court has not guaranteed counsel to civil litigants in the same manner it has to criminal defendants.  See Ky. W. Va. Gas, 837 F.2d at 618; cf. Gideon v. Wainright, 373 U.S. 335 (1963).  Contrary to defendants' interpretation, Kentucky West Virginia Gas stands only for the narrow proposition that a civil litigant has no due-process right to insist on counsel of their choosing "where there exists a potential for conflict." See Ky. W. Va. Gas, 837 F.2d at 618.  It does not hold, and cannot fairly be read to hold, that there exists no constitutional right to hire counsel of one's choice *at all*.

The general right to hire and consult with counsel of choice in civil litigation falls within the ambit of the First Amendment.[7]  The Supreme Court has not explicitly delineated the contours of this right, but it has recognized that the First Amendment's freedoms of speech, assembly, and petition protect a union's right to collectively hire an attorney to assist in legal affairs.  See United Mine Workers of Am. v. Ill. State Bar Ass'n, 389 U.S. 217, 221-22 (1967); see also United Transp. Union v. State Bar of Mich., 401 U.S. 576, 585-86 (1971).  The First Amendment interest implicated in those cases "was primarily the right to associate collectively for the common good," Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 335 (1985), but the Court has said that its underlying concern "that the aggrieved receive information regarding their legal rights and the means of effectuating them . . . applies with at least as much force to aggrieved individuals as it does to groups," Bates v. State Bar of Ariz., 433 U.S. 350, 376 n.32 (1977).

Several courts of appeals have interpreted these Supreme Court cases as acknowledging a First Amendment right, grounded in its freedoms of speech, association, and petition, "to hire and consult an attorney."  See Denius v. Dunlap,

---

[7] The General Assembly argues that Kentucky West Virginia Gas defeats the Association's counsel-related claims whether framed as procedural-due-process or First-Amendment violations.  (Doc. 63 at 23 n.1).  Assuming arguendo that the court of appeals intended a wholesale rejection of any due-process right to counsel of choice—and we are not convinced that it did—the decision said nothing of First Amendment rights.  Although the plaintiff utility raised both First-Amendment and due-process claims before the district court, the question presented to the court of appeals was narrow: the utility argued "that joint representation of different entities which share a substantial interest is protected by the due process clause of the Fifth Amendment," see Ky. W. Va. Gas, 837 F.2d at 618, and the court of appeals explored the claim solely through a due-process lens, see id. at 618-19.

209 F.3d 944, 953-54 (7th Cir. 2000) (citing <u>DeLoach v. Bevers</u>, 922 F.2d 618, 620 (10th Cir. 1990); <u>Martin v. Lauer</u>, 686 F.2d 24, 32 (D.C. Cir. 1982)); <u>Mothershed v. Justices of Sup. Ct.</u>, 410 F.3d 602, 611 (9th Cir. 2005) (citing <u>United Mine Workers</u>, 389 U.S. at 221-22; <u>Denius</u>, 209 F.3d at 953; <u>DeLoach</u>, 922 F.2d at 620).[8]  District courts within the Third Circuit have too.  <u>See, e.g.</u>, <u>Neuberger v. Gordon</u>, 567 F. Supp. 2d 622, 635 (D. Del. 2008) (citing <u>Denius</u>, 209 F.3d at 953; <u>Mothershed</u>, 410 F.3d at 611; <u>DeLoach</u>, 922 F.2d at 620; <u>Martin</u>, 686 F.2d at 32); <u>Ober v. Miller</u>, No. 1:04-CV-1669, 2007 WL 4443256, at *14 (M.D. Pa. Dec. 18, 2007) (Conner, J.) (quoting <u>Cipriani v. Lycoming Cty. Hous. Auth.</u>, 177 F. Supp. 2d 303, 323-24 (M.D. Pa. 2001) (citing <u>Denius</u>, 209 F.3d at 953)).  We agree with the *ratio decidendi* of these courts and conclude that, while a civil litigant may not have a due-process right to *appointed* counsel, the First Amendment generally protects their right to consult with and *hire* counsel of their choosing.

By applying the Attorneys Act to the Joint Underwriting Association, Act 15 interferes directly with this First Amendment right.  The General Assembly claims that the Association is free to consult with and hire its preferred private attorneys, and that the Attorneys Act "merely reserves the Commonwealth a seat at the trial table during any JUA-related litigation."  (Doc. 41 at 27-28).  Governor Wolf likewise

---

[8] Our court of appeals has not squarely addressed the issue.  In a nonprecedential opinion issued earlier this month, the panel suggested that whether the right exists is an open question in this circuit.  <u>See</u> <u>Jacobs v. City of Phila.</u>, No. 20-1967, ___ F. App'x ___, 2020 WL 7040966, at *2 n.2 (3d Cir. Dec. 1, 2020) (*per curiam*) (citing <u>Mothershed</u>, 410 F.3d at 611).  Other courts of appeals have recognized a similar right sounding in due process.  <u>See</u> <u>Tex. Catastrophe Prop. Ins. Ass'n v. Morales</u>, 975 F.2d 1178, 1180-81 (5th Cir. 1992) (citing, *inter alia*, <u>Gray v. New England Tel. & Tel. Co.</u>, 792 F.2d 251, 257 (1st Cir. 1986)).

intimates that the Association could be allowed to keep its current counsel.  (See Doc. 48 at 32; Doc. 59 at 19).  It is unclear from where defendants are deriving this authorization for private counsel: the Attorneys Act states unequivocally that "[t]he Attorney General shall represent . . . all Commonwealth agencies" in actions by or against those agencies and gives the Attorney General discretion to delegate such representation "to . . . *the General Counsel*" in certain circumstances.  See 71 PA. STAT. AND CONS. STAT. ANN. § 732-204(c) (emphasis added).  Although the Attorneys Act permits the Attorney General to authorize "counsel for an independent agency" to handle "any particular litigation or category of litigation," see id. § 732-204(c), Act 15 clearly designates the Association a "Commonwealth agency," see Act 15, § 1505-B, not an "independent agency," see 71 PA. STAT. AND CONS. STAT. ANN. § 732-102. Even if we were to credit defendants' assertion that the Attorneys Act allows Commonwealth agencies to hire private litigation counsel, their assertions come with a significant catch—the Association's decision to hire private counsel, defendants explain, would be subject to "Commonwealth permission."  (Doc. 41 at 27-28; see also Doc. 54 at 34; Doc. 59 at 19).

Compelling the Joint Underwriting Association to accept Commonwealth representation effectively vitiates its First Amendment right to consult with and hire civil counsel of its choice.  Defendants have offered no meaningful argument to the contrary, other than their claim that this constitutional right does not exist.  We find that it does, and that Section 1505-B(1) of Act 15 violates it.  We will grant summary and declaratory judgment to the Association on Count IV.

### C.      Substantive Due Process

The Association lastly claims that Act 15, on the whole, violates its right to substantive due process.  Because we have already held that Section 1502-B and Section 1503-B violate the Takings Clause and that Section 1505-B(1) violates the First Amendment, we focus our analysis here on the sections of Act 15 that remain.  They are Section 1504-B, which requires the Association to hold quarterly public meetings subject to the Sunshine Act; Section 1505(B)(2) through (B)(4), which considers the Association a "Commonwealth agency" strictly for purposes of the Right-to-Know Law, PennWATCH Act, and Commonwealth Procurement Code[9]; and Section 1506-B, which requires the Association to provide certain employee-related information to the state, to conduct its operations rent-free in state-owned office space, and to coordinate with the Department of Revenue concerning access to certain tax information.

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  Our court of appeals has differentiated challenges to legislative acts and challenges to nonlegislative acts in its substantive-

---

[9] The Right-to-Know Law requires Commonwealth agencies to make their records available to the public.  See 65 PA. STAT. AND CONS. STAT. ANN. § 67.101 et seq.  The PennWATCH Act requires Commonwealth agencies to disclose spending information, including employee salaries, which is then posted to a public database and website.  See 72 PA. STAT. AND CONS. STAT. ANN. § 4664.1 et seq.  The Commonwealth Procurement Code requires Commonwealth agencies to procure goods and services through the state's procurement processes and bidding procedures.  See 62 PA. STAT. AND CONS. STAT. ANN. § 101 et seq.

due-process jurisprudence.  See Nicholas v. Pa. State Univ., 227 F.3d 133, 139 (3d

Cir. 2000).  When, as here, a plaintiff challenges a legislative enactment and does

not claim that the enactment burdens a fundamental right, rational-basis review

applies.  See Am. Express Travel Related Servs. v. Sidamon-Eristoff, 669 F.3d 359,

366 (3d Cir. 2012) (quoting Nicholas, 227 F.3d at 139).

The rational-basis test grants the legislature "considerable latitude."

Heffner v. Murphy, 745 F.3d 56, 79 (3d Cir. 2014) (citing FCC v. Beach Commc'ns,

Inc., 508 U.S. 307, 315 (1993)).  The legislation must stand, even if it burdens some

cognizable interest, if the defendant can show "(1) the existence of a legitimate state

interest that (2) could be rationally furthered by the statute."  Sidamon-Eristoff,

669 F.3d at 366 (citing Nicholas, 227 F.3d at 139).  Stated differently, to prevail on

a substantive-due-process claim, like the instant one, that does not implicate a

fundamental right, a plaintiff must "negative every conceivable basis which might

support" the legislature's choice.  See id. (quoting Beach Commc'ns, 508 U.S. at

315).  Rational-basis review, while not "toothless," id. (quoting Mathews v. Lucas,

427 U.S. 495, 510 (1976)), requires courts to afford "significant deference to the

legislature's decision-making and assumptions," id. (citing Sammon v. N.J. Bd. of

Med. Exam'rs, 66 F.3d 639, 645 (3d Cir. 1995)).

The parties dispute whether the Association has identified a life, liberty,

or property interest on which to premise a Fourteenth Amendment claim.  The

Association contends that Act 15 interferes with its "right as a private entity to

engage in its business of selling MPL insurance without unreasonable government

interference."  (See Doc. 45 at 32 (citing Greene v. McElroy, 360 U.S. 474, 492 (1959);

Meier v. Anderson, 692 F. Supp. 546, 551-52 (1988))).  The General Assembly does not deny that such a private right exists.  It simply reiterates its view that, because the Association was created by the Commonwealth to solve a public-health crisis, "it is essentially an 'instrumentality of the state'" not possessed of that right.  (See Doc. 63 at 18 (citation omitted)).  We need not determine whether the Association has the liberty interest it claims because, even if it does, the General Assembly has sufficiently justified Act 15's interference with that interest.

It is important for purposes of our substantive-due-process analysis to briefly revisit, and appropriately cabin, our decisions in JUA I and JUA II, because the Association relies so heavily on those decisions in resisting any Commonwealth oversight and support.  (See, e.g., Doc. 57 at 24 (quoting JUA II, 381 F. Supp. 3d at 337)).  Given the nature of the legislation at issue in those cases, and the nature of a Fifth Amendment takings claim, our chief inquiry was actually quite narrow: whether the Association's reserves and surplus were private property belonging to the Association or public property belonging to the Commonwealth.  In holding that the Association is a private entity and its funds private property, we rejected defendants' claim that the Association is the state itself.  We have never denied, however, that the Association is a unique creature—a state-created private entity that furthers the General Assembly's public-health objectives.  See JUA I, 324 F. Supp. 3d at 523-24; JUA II, 381 F. Supp. 3d at 326-27.

Despite the fact that the Joint Underwriting Association's property and operations are decidedly private, its *mission* is indisputably public.  The Association is an integral part of a medical care availability and insurance framework that the

legislature has deemed "essential to the public health, safety and welfare of all citizens of the Commonwealth."  40 PA. STAT. AND CONS. STAT. ANN. § 1303.102. There can be no dispute on this point—the Association's own plan of operations opens with recognition of its statutory origin and its purpose "to offer [MPL] insurance to health care providers in accordance with" the MCARE Act.  (See Doc. 4-2 ¶ 2).  Against this backdrop, we have little difficulty concluding that Act 15's application of oversight and support measures to the Association, the state's designated MPL insurer of last resort, is supported by a rational basis.

Defendants explain that Act 15 furthers important transparency and accountability objectives by subjecting the Association to certain oversight laws, and that lowering its operational expenses, for example, by providing free office space, furthers the public's interest in ensuring the Association remains afloat. (See Doc. 41 at 23-25; Doc. 48 at 27-29; Doc. 54 at 22-26; Doc. 59 at 14-15).  What is more, the Association concedes that "prevent[ing] the JUA from failing in its work of assuring availability of MPL insurance" is a "possible legitimate justification" for

these measures.  (See Doc. 45 at 34).  We agree that assuring continued viability of

the state's MPL insurer of last resort is a legitimate justification for Act 15.[10]

Recognizing that defendants have articulated a "legitimate state interest,"

the Association focuses on challenging the rationality between end and means.

Its argument is threefold: that Act 15's measures are unnecessary given the size of

the Association's surplus, (see, e.g., Doc. 57 at 26-28); that they are mere pretext for

another state takeover attempt, (see, e.g., id. at 27); and that the claimed rationale

finds no explicit support in the text of Act 15 itself, (see, e.g., Doc. 45 at 33-34).  We

address these arguments *seriatim*.

As to the first argument, there is no need for "mathematical precision"

when the legislature acts in furtherance of an identified interest.  See Concrete

---

[10] The Association repeatedly emphasizes our statement from JUA II that, when it created the Association, the General Assembly chose to meet its public-health objectives through "a private entity . . . in which the state is not alone or, indeed, at all interested."  (See, e.g., Doc. 64 at 10, 12, 25 (quoting JUA II, 381 F. Supp. 3d at 341)).  As should be clear from context, that statement referred only to the Commonwealth's lack of a *pecuniary* interest in the Association.  See, e.g., JUA II, 381 F. Supp. 3d at 333 (emphasizing lack of state funding and statutory disclaimer of responsibility for Association's debts and liabilities (citing JUA I, 324 F. Supp. 3d at 537-38)).  We also reject any suggestion that Act 15 improperly attempts to reconstitute the Association as a Commonwealth agency or otherwise "alter[s] JUA's private nature."  (See, e.g., Doc. 45 at 15-16).  It does not, and it could not: JUA II holds squarely that "[t]he Commonwealth cannot legislatively recapture this private association."  See JUA II, 381 F. Supp. 3d at 343.  Unlike Act 41's attempt to claim the Association as a Commonwealth agency, Act 15 merely treats it like one for limited purposes.  See Act 15, § 1505(B) ("The [Association] shall be *considered* a Commonwealth agency *for purposes of*" the Right-to-Know Law, PennWATCH Act, and Commonwealth Procurement Code (emphasis added)); see also Harristown Dev. Corp. v. Commonwealth, 614 A.2d 1128, 1131 (Pa. 1992) (holding that the General Assembly could designate private entity that did large volume of business with the state a Commonwealth "agency" for purposes of the Sunshine Act and Right-to-Know Law).

Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 639 (1993). That the Act may seem "needless" or "wasteful" in the eyes of the Association does not matter. See Williamson v. Lee Optical of Okla. Inc., 348 U.S. 483, 487 (1955). "[I]t is for the legislature," not the Association or this court, "to balance the advantages and disadvantages" of Act 15. See id. Our sole inquiry is whether the General Assembly could have rationally concluded that the public interest would be furthered by applying oversight and support to the Association. See Sidamon-Eristoff, 669 F.3d at 366. Since the Association itself has taken the position that every dollar counts—informing the Insurance Department that its "surplus is not excessive" and that divesting "any of the Association's surplus . . . could adversely affect [its] ability . . . to fulfill its mandate," JUA I, Doc. 7-3 (M.D. Pa. Nov. 8, 2017)—the legislature's conclusion is sufficiently rational.

The Association's second argument is perhaps reasonable, particularly in light of the legislature's successive and creative attempts to access the Association's surplus, but nonetheless without merit. The Association remonstrates that "the state wants [its] money" and implies that, by applying new oversight and support to the Association, defendants are laying the groundwork to reclaim the Association— and its surplus—for the Commonwealth. (See Doc. 57 at 27; see also Doc. 45 at 16-19, 20-21). That may well be. But we cannot "second-guess legislative choices or inquire into whether the stated motive *actually* motivated the legislation." Heffner, 745 F.3d at 79 (emphasis added) (citing U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 179 (1980)). Whether the General Assembly has an ulterior motive is of no moment, so long as there is at least one legitimate motive to sustain Act 15.

Third, the Association argues that the challenged provisions of Act 15 are irrational because they bear no relation to the Act's stated purpose of "provid[ing] for the administration of the 2019-2020 Commonwealth budget."  (Doc. 45 at 33 (quoting Act 15, § 1(1))).  There is no requirement, however, that the Commonwealth's legitimate objectives appear in the enactment itself.  Legislation will survive under rational-basis scrutiny if it "rationally furthers *any* legitimate state objective," even if the court must "hypothesize the motivations."  Sidamon-Eristoff, 669 F.3d at 367 (quoting Malmed v. Thornburgh, 621 F.2d 565, 569 (3d Cir. 1980)).  We need not hypothesize in this case.  Defendants have articulated "a legitimate state interest" in overseeing the Association and ensuring its success, and that interest is "rationally furthered" by Act 15.  See id. at 365.  Accordingly, the Association has failed to establish a substantive-due-process violation, and defendants are entitled to summary judgment on Count I.

## D.     Legislative Immunity

As in JUA I, Governor Wolf again invokes legislative immunity.  The doctrine of legislative immunity shields legislators from liability for "all actions taken 'in the sphere of legitimate legislative activity.'"  Baraka v. McGreevey, 481 F.3d 187, 195-96 (3d Cir. 2007) (quoting Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998)).  Legislative immunity extends beyond legislators and protects any public officials, including governors and others outside of the legislative branch, when they perform "legislative functions."  See id.  It applies, for example, when the public official's sole connection to challenged legislation is promoting it, passing it, or signing it into law.  See id. at 196-97.

Governor Wolf contends that he "solely signed Act 15 into law" and has no other connection to the Association's claims or to the Act.  (See Doc. 48 at 16-18).  As before, we disagree.  See JUA I, 2017 WL 5625722, at *7.  Governor Wolf did sign Act 15 into law.  But he is also authorized under Act 15 to initiate a budget-estimate request under Section 1503-B(a) upon which appropriations under Section 1502-B would be determined.  See Act 15, § 1503-B.  Additionally, the Attorneys Act contemplates scenarios in which the Governor's attorney, the Office of General Counsel, would either represent the Association or determine who should.  See 71 PA. STAT. AND CONS. STAT. ANN. § 732-204(c).  Governor Wolf is not so attenuated from Act 15's problematic provisions as his counsel suggests.  We thus decline to apply legislative immunity.[11]

### E.   Permanent Injunction

Before the court may grant permanent injunctive relief, the Joint Underwriting Association must prove, first, that it will suffer irreparable injury absent the requested injunction; second, that legal remedies are inadequate to compensate that injury; third, that balancing of the respective hardships between the parties warrants a remedy in equity; and fourth, that the public interest is not disserved by an injunction's issuance.  See eBay, Inc. v. MercExchange, LLC, 547

---

[11] We also reject the argument that the Association does not have standing and has failed to establish an actual case or controversy as to Governor Wolf.  (See Doc. 48 at 18-20).  This argument rests on the view, rejected above, that Governor Wolf is a party to this lawsuit based solely on his "[g]eneral authority to enforce the laws of the state."  (See id. (citing 1st Westco Corp. v. Sch. Dist. of Phila., 6 F.3d 108, 113 (3d Cir. 1993))).

U.S. 388, 391 (2006) (citations omitted).  Defendants contest the Association's request for permanent injunctive relief.

We conclude that the Joint Underwriting Association is entitled to a permanent injunction specifically limited, however, to the unconstitutional sections of Act 15.  Sections 1502-B and 1503-B of Act 15 constitute a regulatory taking and threaten imminent and irreparable injury to the Association.  Through Act 15, the General Assembly intends to be the sole source of funding for the Association's operations.  As we have explained, if this occurs, the Association would be instantly divested of its right to use its existing, private funds as it sees fit.  No remedy at law could adequately compensate for that loss of control.  As to Section 1505-B(1), it is well settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976); Ctr. for Investigative Reporting v. SEPTA, 975 F.3d 300, 317 (3d Cir. 2020) (quoting Elrod, 427 U.S. at 373).  There is further urgency with respect to this provision, given Governor Wolf's statement that, while the Act would not apply within this series of lawsuits, the Association, "on a moving-forward basis, would have to use [the Attorney General's] office."  (Doc. 33 at 34:24).

Defendants, for their part, have articulated no reciprocal harm to the Commonwealth or the public from enjoining enforcement of the unconstitutional components of Act 15.  Nor have they alleged a public interest in enforcing those sections; rather, their public-interest arguments focus almost entirely on defending the oversight provisions that we have already held survive constitutional scrutiny. We find that defendants will not be harmed by a permanent injunction narrowly

tailored to the unconstitutional provisions of Act 15, nor will the public interest be disserved thereby.  We will thus grant the Association's request for a permanent injunction only to the extent that we will enjoin enforcement of Sections 1502-B, 1503-B, and 1505-B(1).

## IV.   <u>Conclusion</u>

We will grant in part and deny in part the parties' cross-motions for summary judgment as more fully articulated herein.  An appropriate order shall issue.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:        December 22, 2020